Carlos Lamont ORDWAY, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2010–SC–000783–MR.

Supreme Court of Kentucky.

Feb. 21, 2013.

Kathleen Kallaher Schmidt, Appeals Branch Manager, Emily Holt Rhorer, Brandon Neil Jewell, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, Heather Michelle Fryman, Assistant Attorney General, Office of Criminal Appeals, Office of the Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice VENTERS.

Carlos Lamont Ordway appeals from a judgment of the Fayette Circuit Court convicting him of two counts of intentional murder and sentencing him to death under both verdicts based upon the aggravating factor of causing multiple deaths. KRS 532.025(2)(a)6.[1] The deaths occurred as a result of a shooting during which Appellant claims he was acting in self-defense. As further discussed below, Appellant raises multiple issues in support of reversal of his convictions and sentences. As ex-

---

1. Appellant was indicted on two counts of intentional murder and tampering with physical evidence. Ultimately, the jury acquitted Appellant on the charge of tampering with physical evidence.

plained within our discussion, we determine that reversible error occurred in several instances, including: the admission of testimony from a police detective that Appellant's behavior after the shooting was inconsistent with someone who had actually acted in self-defense, thereby implying that from his experienced observations that Appellant had fabricated his self-defense claim; the admission of evidence of Appellant's post-arrest invocation of his right to remain silent; and the trial court's failure to strike for cause a potential juror who was the sibling of the victim's advocate directly connected to this case; and the exclusion of evidence of the victim's statement immediately before the shooting. We address these issues below, along with other matters that are likely to recur upon retrial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On a summer night in Lexington at about 10:00 p.m., Appellant was riding in the front seat of a stolen car with two acquaintances. Rodriquez "Hot Rod" Turner was driving and Patrick "Lee Lee" Lewis was in the back seat directly behind Appellant. The following is Appellant's account of what happened.

Both Turner and Lewis were armed with guns, and they knew that Appellant had drugs in his possession. Appellant testified that Lewis put a gun to his head, and threatened, "give it up, you know what time it is, or you're going to die." Turner then drew a gun and placed it on his lap, leading Appellant to believe the two. were working together to steal his drugs and kill him. Appellant gave them all of the drugs he had, but he feared that they were not satisfied. He testified that he was "scared to death." He reacted by smacking the gun out of Lewis's hand and then grabbing the gun from Turner's lap. He

then shot Lewis, whom he perceived as the more immediate threat because Lewis was within reach of the dropped gun. When Turner, who was still driving, reached to get his gun back from Appellant, Appellant shot him, too. The car then crashed and the gun fell out of Appellant's hand. Appellant testified that he got out of the vehicle and looked back to see Lewis trying to get out of the car with a gun in his hand. Perceiving that Lewis was a continuing threat, Appellant grabbed Lewis's gun and shot him with it. Because he believed that Turner was reaching for a gun, Appellant also shot him again.

Appellant therefore admits that he shot each of the victims multiple times, but claims that all of the shots were fired in self-defense. Other testimony established that Lewis was shot five times and Turner three times. The crash of the car caught the attention of several persons in the area. Witnesses were plentiful and their perceptions of the dramatic event varied.

One local resident who heard the crash saw Appellant standing beside the wrecked vehicle, lean into it and shoot, first the driver, and then the backseat passenger. Another witness on the scene saw a man (apparently Appellant) open the front door of the wrecked vehicle, shoot first the passenger in the backseat, then the driver. Yet another nearby resident testified that after he heard the crash, he saw someone walk toward the wrecked car, draw a gun, and shoot into the car two times from a distance of four or five feet.

A motorist stopped at the intersection where the crash occurred said she first saw Appellant crouched down on the curb. She testified that Appellant approached her vehicle, tugged at the passenger-side door handle, and said repeatedly that he had a gun. She promptly drove away and called 911. Another motorist at the intersection said a man stood beside her car,

pointed a gun at her front-seat passenger, and told the passenger to get out of the car. That motorist also drove away and called 911. Appellant admitted that he approached both of those vehicles, but he claimed he was only seeking help, not a get-away vehicle. Emergency responders arrived at the scene and saw Appellant stumbling around in the middle of the road, talking to himself.

Both victims were found buckled into their seat belts. Lewis was pronounced dead at the scene, and Turner died shortly thereafter at the hospital. When a police officer arrived on the scene, bystanders pointed out Appellant and said "that's him." Appellant's strange behavior continued as he was transported to the hospital, alternating between periods of screaming agitation and periods of non-responsiveness. At the hospital, Appellant's continued state of agitation caused him to be put in restraints.

Appellant was interviewed at the hospital by police detective Wilson for about ninety seconds. According to Wilson, Appellant said that Turner and Lewis had tried to kill him and that he shot them in self-defense; Appellant stated that the victims were his friends, but he also said, somewhat inconsistently, that he did not really know them. Appellant was arrested. While lodged in jail, but prior to the initiation of any custodial interrogation or *Miranda* procedures, he spontaneously said to Detective Wilson, "I got fuckin' nothing for you." Based upon his interactions with Appellant and upon his other knowledge of the events, and over Appellant's objection, Wilson testified that Appellant's behavior in the aftermath of the shooting was not consistent with the behavior of the typical person who had acted in self-defense, thereby implying to the jury that it should reject his claim of self-defense.

During the autopsy, a substance found in Lewis's pocket was determined to be fake crack, commonly called "fleece"—a substance manufactured to look like rocks of actual crack cocaine. However, this evidence was later lost before Appellant had an opportunity to have it examined. Other evidence included a bag of ecstasy found in the driver's side door compartment, and bags of marijuana found in the back of the vehicle and in the center console.

Also found in the center console was an audio recorder. Prior to trial, Appellant's counsel was told that nothing was recorded on the device. In the midst of the trial, however, Appellant's counsel learned that the recorder had captured the voice of a man saying, at least according to Appellant's interpretation, ". . . going to the store to get ready in about ten minutes to practice okay, we gonna see if he's gonna cry, we gonna record it. Okay." Appellant claimed this evidence was exculpatory and he moved for a mistrial because its late disclosure, midway through the trial, prevented him from taking full advantage of this exculpatory evidence. The trial court denied the motion.

During the penalty phase of the trial, the Commonwealth presented evidence concerning Appellant's prior convictions, including juvenile adjudications which had not been specifically provided to Appellant by the Commonwealth until after the conclusion of the guilt phase. Despite the mitigating evidence of Appellant's traumatic childhood, the jury found the aggravating factor of multiple intentional murders and recommended a sentence of death on both counts. The trial court entered final judgment in accordance with the jury's verdict and imposed the two sentences of death. Appellant brings this appeal as a matter of right. Ky. Const. § 110.

## II. STANDARDS OF REVIEW IN DEATH PENALTY APPEALS

Appellant seeks review of thirty-one listed issues, some of which contain several sub-parts, including some that were not preserved for review by timely objection pursuant to RCr 9.22 or RCr 9.54. Because we treat unpreserved error differently in death penalty cases, we begin with a brief summary of our palpable error standards in these types of cases, and also set out in this section other relevant standards of review we employ in our examination of Appellant's claims.

■■■ Where the death penalty has been imposed, we nonetheless carefully review unpreserved errors without regard to the palpable error limitations of RCr 10.26, as stated in *Sanders v. Commonwealth:*

> [If] the so-called error occurred, we begin by inquiring: (1) whether there is a reasonable justification or explanation for defense counsel's failure to object, e.g., whether the failure might have been a legitimate trial tactic; [but] (2) if there is no [such] reasonable explanation, [we then address] whether the unpreserved error was prejudicial, i.e., whether the circumstances in totality are persuasive that, minus the error, the defendant may not have been found guilty of a capital crime, or the death penalty may not have been imposed. All unpreserved issues are subject to this analysis.

801 S.W.2d 665, 668 (Ky.1990) (internal citations omitted); *see also Johnson v. Commonwealth,* 103 S.W.3d 687, 691 (Ky. 2003).

"The rationale for this rule is fairly straightforward. Death is unlike all other sanctions the Commonwealth is permitted to visit upon wrongdoers." *Rogers v. Commonwealth,* 992 S.W.2d 183, 187 (Ky.

1999). Thus, the invocation of the death penalty requires a more expansive standard of review than is normally necessary in the criminal justice process. *Id.; see also* KRS 532.075(2) ("The Supreme Court shall consider ... any errors enumerated by way of appeal.").

■■■ Preserved errors are reviewed pursuant to our normal standards. As noted in *Brown v. Commonwealth,* 313 S.W.3d 577, 595 (Ky.2010), "preserved evidentiary and other non-constitutional errors will be deemed harmless under RCr 9.24 and *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) if we can say with fair assurance that the judgment was not substantially swayed by the error." *See also Winstead v. Commonwealth,* 283 S.W.3d 678, 689 (Ky.2009). "Our inquiry is not simply 'whether there [is] enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.'" *Id.* at 595 (quoting *Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239). "As to those preserved constitutional errors which are subject to harmless error review, they must be shown to be 'harmless beyond a reasonable doubt' in order to be deemed harmless." *Id.* (quoting *Winstead,* 283 S.W.3d at 689 n. 1).

■■■ And finally, we review a trial court's evidentiary rulings for an abuse of discretion. *Penman v. Commonwealth,* 194 S.W.3d 237, 245 (Ky.2006).[2] "The test for abuse of discretion is whether the trial [court's] decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999); *Meece v.*

---

**2.** *Overruled on other grounds by Rose v. Commonwealth,* 322 S.W.3d 76 (Ky.2010).

*Commonwealth,* 348 S.W.3d 627, 645–46 (Ky.2011).

## III. ADMISSION OF POLICE DETECTIVE'S OPINION THAT APPELLANT DID NOT ACT LIKE THE TYPICAL INNOCENT PERSON

■ Appellant's first two arguments are essentially identical, and so we consider them together in a single discussion. Appellant contends that the trial court erred by permitting Detective Wilson to testify, from his experience investigating self-defense related homicides, how persons who legitimately exercise the right of self-protection typically behave. He opined that Appellant did not act like those who had lawfully protected themselves but, had instead acted like those who were fabricating a self-protection defense. Because the trial court's rulings permitting this testimony were clearly an abuse of discretion, and because the testimony was not otherwise harmless error, we are constrained to reverse Appellant's murder convictions based upon the admission of this highly prejudicial testimony.

Detective Wilson testified as follows in response to questioning by the Commonwealth:

> Prosecutor: Now, is there . . . . when you have investigated situations in which self-defense is raised. . . .
>
> Wilson: Um hum [yes].
>
> Prosecutor: . . . as a defense? Does the person who claims self-defense typically leave the scene?
>
> Wilson: No, they do not.
>
> Prosecutor: Well, what typically happens in those kinds of a situation?

**[Objection by defense counsel overruled]**

> Wilson: Those individuals that have been through an incident where they've had to use lethal force to defend their lives typically stay at the scene. They're the ones that call 911 or the police to request assistance. If they don't have a phone they, they ask or yell for help, you know, please call 911. Uh, they leave whatever weapon they have, they put it down and wait for police officers to respond. They certainly don't leave the scene; they don't try to commandeer vehicles. . . .

**[Objection by defense counsel overruled]**

> Wilson: They don't try to commandeer vehicles with force with a gun in their hand. And typically what I found is extremely consistent, these individuals cooperate with the police fully. They can't wait to get their story out.

**[Objection followed by a bench conference and motion for a mistrial.]**

Wilson implied that he had unique expertise in how those who have lawfully engaged in self-protection act, and then authoritatively testified through opinion testimony that Appellant, by the way he acted following the shootings, did not fit that profile. Appellant objected throughout this phase of Wilson's testimony. Upon review, we are convinced that the trial court erroneously ruled that this evidence was admissible.[3]

The testimony was incompetent because it permitted the police detective to authoritatively suggest how innocent persons behave after they lawfully engage in an act of self-defense, and to then, with some measure of certainty, exclude Appellant

---

**3.** The Commonwealth contends that defense counsel's general objections to the testimony did not precisely preserve the issue. We will disregard that potential issue based upon our standards of review applicable to unpreserved error in a death sentence case.

from that class of persons based upon his conduct following the shooting. In *Johnson v. Commonwealth*, 885 S.W.2d 951 (Ky.1994), the defendant was convicted of wanton murder after driving his coal truck through a red light and colliding with another vehicle, causing the death of the driver of the other vehicle. There, upon cross-examination of the defendant, the prosecutor prefaced his question with his observation that "some people who drive these coal trucks make it a practice to run red lights," followed by the question: "Isn't it a fact that that's what you were doing on that particular day?" *Id.* at 953.

In reversing, we held that "[t]o permit the Commonwealth to cross-examine about the habit of a class of individuals for the purpose of showing how one unique individual in that class might have acted on a given occasion would invite the jury to arbitrarily hold an individual responsible based on his membership in the class." *Id.* Pursuant to this rule, a party may not introduce evidence of the habit of a class of individuals either to prove that another member of the class acted the same way under similar circumstances or to prove that the person was a member of that class because he acted the same way under similar circumstances. *Miller v. Commonwealth*, 77 S.W.3d 566, 572 (Ky.2002).[4] Detective Wilson's testimony contrasting his opinion on the habits of suspects who, as a class, have truthfully invoked the defense of self-protection against the class of those who have lied about it, and how

Appellant's post-shooting conduct was consistent with the latter, should have been excluded as improper opinion testimony and irrelevant. As in *Johnson*, the admission of such evidence was reversible error.

It is worth noting that if this type of expert behavioral testimony were to be admissible in self-defense cases, there is no immediately apparent reason that similar behavioral testimony would not *also* be admissible in *any* trial to show the defendant's guilt or innocence. Foreseeably, many trials would then develop into a "battle of experts" debating about how guilty persons would act in the situation at hand, and whether the defendant's post-crime conduct pointed toward guilt or innocence. The determination of an individual's guilt or innocence must be based upon the evidence of the particular act in question; it cannot be extrapolated from an opinion, that his behavior after the event comports with some standardized perception of how the "typical" suspect behaves.

Of course, a prosecutor may continue to *argue* reasonable inferences derived from a particular defendant's behavior, such as flight from the scene of a crime, is indicative of guilt.[5] Those are simply appeals to the common sense and collective wisdom of the jury, based upon their own everyday experiences. Here, in contrast, the testimony of Wilson, in effect, urged the jury to depend upon his apparent expertise as a police officer and his

---

4. *Cf.* KRE 406, which provides that "Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice." It bears emphasis, however, that this rule refers to the habit of a *person*, not the habit of a *class* of persons.

5. As a general rule, proof of flight to elude capture or prevent discovery is admissible because "flight is always some evidence of a sense of guilt." *Day v. Commonwealth*, 361 S.W.3d 299, 303 (Ky.2012), and *Rodriguez v. Commonwealth*, 107 S.W.3d 215, 218 (Ky.2003)(quoting *Hord v. Commonwealth*, 227 Ky. 439, 13 S.W.2d 244, 246 (1928)).

perception and opinion about matters outside the realm of common knowledge. We do not recognize as legitimate subjects of expert opinion, "how guilty people typically behave" or "how innocent people do not act." *Cf. Newkirk v. Commonwealth*, 937 S.W.2d 690, 693 (Ky.1996) ("there is no such thing as expertise in the credibility of children.").[6]

 In summary, the admission of Detective Wilson's testimony on this point requires reversal of Appellant's murder convictions. The error was not harmless. The opinion of an experienced and respected police detective that Appellant's conduct did not match the stereo-typical conduct of an innocent person acting in self-defense authoritatively portrayed Appellant's defense as a fabrication. That testimony was clearly devastating to Appellant's claim of self-defense, and accordingly, we are unable to conclude that the inadmissible evidence was harmless. *Winstead*, 283 S.W.3d at 688–89.

Upon retrial, Detective Wilson may not testify regarding his opinion or his experience in the realm of how guilty or innocent suspects act. Of course, he may (as may any other witness) describe Appellant's conduct, demeanor, and statements following the shootings based upon his or her observations to the extent that the testimony is not otherwise excluded by the Rules of Evidence.

---

**6.** We distinguish the kind of police expertise we recognized in *Allgeier v. Commonwealth*, 915 S.W.2d 745 (Ky.1996): a police officer's opinion based on training and experience as to whether, e.g., there was or was not evidence of a forced entry, "can be distinguished from the more extensive and complex knowledge required for testimony by traditional experts, such as accident reconstructionists and forensic pathologists." *Id.* at 747. Similarly, in *Sargent v. Commonwealth*, we allowed officers to render opinions that possession of

## IV. DET. WILSON'S COMMENTS ON APPELLANT'S POST-ARREST SILENCE

 Next, Appellant contends that error occurred when Detective Wilson was permitted to testify regarding Appellant's invocation of his right not to speak to the police following his arrest. We agree with Appellant that the statement was not admissible, but we do so only because we believe the statement was irrelevant. KRE 402.

After Appellant's arrest, Detective Wilson went to the jail to interview him. Before Detective Wilson said anything to Appellant, Appellant spontaneously said, "I got fuckin' nothing for you," which we construe as a crude means of invoking the Fifth Amendment right to remain silent.

 The Commonwealth is prohibited from introducing evidence or commenting in any manner on a defendant's silence once that defendant has been informed of his rights and taken into custody. *See, e.g., Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Romans v. Commonwealth*, 547 S.W.2d 128, 130 (Ky. 1977); *see also Miranda v. Arizona*, 384 U.S. 436, 468 n. 37, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Miranda* warnings implicitly assure their recipient that his silence will not be used against him. It would be fundamentally unfair if the price of exercising the right to remain silent was the prejudicial effect of appearing to be

---

fifteen pounds of marijuana was for the purpose of sale, not personal use "based on experience derived from many drug related investigations." 813 S.W.2d 801, 802 (Ky.1991). This type of expert opinion has been almost routinely admitted in drug cases. *See Dixon v. Commonwealth*, 149 S.W.3d 426, 430 (Ky. 2004). Predictions of specific human behavior in response to traumatic experiences and opinions based thereon have not yet reached the level of scientific reliability to be worthy of admission as evidence in a court of law.

uncooperative with police. *Romans*, 547 S.W.2d at 130.

Appellant was clearly in custody at the time of his "nothing for you" statement, and it is equally clear that before questioning Appellant, Detective Wilson's duty was to advise Appellant of his right under *Miranda* to remain silent. Thus, if Appellant had delayed his outburst until after Wilson gave the *Miranda* warnings, the statement would indisputably have been inadmissible.

That is, however, not what occurred here. Appellant's spontaneous, pre-*Miranda* statement was not induced by any governmental action. Where "no governmental action induce[s] the defendant to remain silent[,]" the Miranda-based fairness rationale does not control. *See Fletcher v. Weir*, 455 U.S. 603, 606, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982); *Jenkins v. Anderson*, 447 U.S. 231, 240, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980); *Baumia v. Commonwealth*, —— S.W.3d ——, 2012 WL 5877581 (Ky.2012) (holding that evidence of defendant's pre-arrest, pre-*Miranda* silence was inadmissible in prosecution's case-in-chief if induced by governmental coercion). Similarly, any voluntary post-*Miranda* warning statements made by the defendant are admissible, even if he has previously invoked his right to remain silent and subsequently voluntarily reinitiates communications with the police. *Anderson v. Charles*, 447 U.S. 404, 408–09, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980); *Virgin Islands v. Martinez*, 620 F.3d 321, 335 (3d Cir.2010).

Because Appellant's statement was not induced by governmental action and there was no implied assurance, via *Miranda*

warnings, that his invocation of silence would not be used against him, the *Miranda* line of cases would not seem to prohibit the use of his spontaneous utterance at trial. *See McNeil v. Wisconsin*, 501 U.S. 171, 182 n. 3, 111 S.Ct. 2204, 115 L.Ed.2d 158, (1991).

Nevertheless, for a different reason we conclude that the statement was inadmissible; namely, the evidence was irrelevant. Appellant's statement to the effect that he was invoking his constitutional right not to speak to Detective Wilson did not "hav[e] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. The Commonwealth suggests that Appellant's outburst evidences a hostile, uncooperative attitude toward police that is indicative of guilt because, so the Commonwealth argues, the innocent are eager to assist police.[7] However, an innocent person, arrested, jailed and falsely accused of murder by the police following the dramatic episode Appellant described might also express in similar fashion his anger or frustration over his predicament. Appellant's outburst tends to prove nothing about whether his use of deadly force was justifiable. Therefore, the evidence was not admissible. KRE 402.

 Similarly, the admission of such evidence would clearly result in the danger of undue prejudice, confusion of the issues, or the misleading of the jury; accordingly, the statement should have also been excluded pursuant to KRE 403.[8] Upon retri-

---

7. It is easy to see how this argument quickly bleeds over into the officer's opinion about how Appellant's behavior differed from the behavior of innocent people.

8. It is worth noting that if Appellant's spontaneous and uncoerced statement had been,

e.g., to the effect, "I killed the victims because they robbed my brother last week," the spontaneous and uncoerced statement would have been highly relevant and, therefore, admissible. This would be so even if the spontaneous statement was made after Appellant had been

al, Detective Wilson may not be permitted to testify regarding Appellant's crude statement spontaneously and preemptively invoking his constitutional right not to speak to Detective Wilson because the statement is irrelevant.

## V. STATEMENTS BY VICTIMS IMMEDIATELY BEFORE SHOOTING

■ Appellant next argues that the trial court erred by sustaining the Commonwealth's objections to what the victims said to him in the vehicle in the moments before the shootings. The only statement Appellant specifically addresses as being improperly excluded is the statement Lewis allegedly made when he put the gun to Appellant's head: "Give it up, you know what time it is, or you're going to die."

■ "In self-defense cases, fear by the defendant of the victim is an element of the defense and can be proved by evidence of violent acts of the victim, threats by the victim, and even hearsay statements about such threats, provided that the defendant knew of such acts, threats, or statements at the time of the encounter." Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 2.15[4][d] (4th ed.2003). Such evidence is admissible because it is not offered to prove the victim's character or to show action in conformity therewith, but to prove the defendant's state of mind—his fear of the victim—at the time

he acted in self-defense. *Saylor v. Commonwealth*, 144 S.W.3d 812, 816 (Ky. 2004).[9]

Lewis's statement, if indeed it was made at all, is plainly a threat that would have reasonably put Appellant in fear for his life. It clearly was admissible in accordance with the foregoing authority and it was clear error to exclude it from the evidence heard by the jury. Upon retrial, the specific testimony we discuss above shall not be excluded.

Appellant suggests that other threatening statements of the victims were also improperly excluded but he does not specifically identify any for our review. Thus, we regard the issue of such other statements as inadequately presented for appellate review. We presume, upon retrial, if properly brought to the trial court's attention, the admission of any threatening statements said to have been made by the victims during the minutes leading up to the shootings will be considered by the trial court in light of the principles discussed above.

## VI. JURY SELECTION ISSUES

Appellant raises several issues relating to jury selection. Because we are reversing this case and remanding for a new trial pursuant to our above holdings, it may be argued that errors in jury selection should be deemed to be moot. They are unlikely to appear again on retrial with different

---

*Mirandized* and he had previously invoked his right to remain silent.

9. There is no controversy about this important and ancient principle that has been consistently observed in our case law. *Moorman v. Commonwealth*, 325 S.W.3d 325, 332 (Ky. 2010); *Commonwealth v. Girkey*, 240 Ky. 382, 42 S.W.2d 513, 514 (1931) ("That such threats and hostile acts on the part of a deceased against a defendant charged with a killing under such circumstances and where he seeks to justify his act on the ground of

self-defense are admissible is well settled."); *Campbell v. Commonwealth*, 88 Ky. 402, 11 S.W. 290 (1889) ("The threats of the deceased to take the life of the accused, accompanied by an effort to do so, such as the attempt to draw his pistol, etc., would, of course, be [relevant to the self-defense issue.]"). Pursuant to these principles, Lewis's statement while holding a gun to Appellant's head, "give it up, you know what time it is, or you're going to die" was clearly admissible.

jurors. However, given the paramount importance of jury selection and our concern that trial courts continue to demonstrate reluctance to excuse problematic jurors, we choose to address the specific issues as general guidance for our trial courts to follow when confronted with similar circumstances in future cases.

Appellant argues the trial court failed to excuse several jurors who should have been excused for cause. He also contends that the trial court improperly excused for cause other jurors who should have been retained on the venire. He also argues that other egregious errors occurred during *voir dire*. We address each of those issues, following a discussion of general jury selection standards.

## A. Preliminary Note

In recent cases we have indicated that, when there is uncertainty about whether a prospective juror should be stricken for cause, the prospective juror should be stricken. The trial court should err on the side of caution by striking the doubtful juror; that is, if a juror falls within a gray area, he should be stricken. We have attempted to make this fundamental rule clear in a series of cases since *Shane v. Commonwealth*, 243 S.W.3d 336 (Ky.2007).[10] Nevertheless, all too often trial courts, as here, inexplicably put at risk not only the resources of the Court of

Justice, but the fundamentally fair trial they are honor-bound to provide, by seating jurors whose ability to try the case fairly and impartially is justifiably doubted. As former trial judges, every member of this Court knows that there is no shortage of citizens in the Commonwealth of Kentucky willing to serve capably and honorably in the most difficult and demanding of trials. What those citizens do not want is to have their time and money spent retrying a difficult case because, in a prior proceeding, a trial judge was too diffident to excuse jurors who were credibly challenged.

We reiterate that trial courts should tend toward exclusion of a conflicted juror rather than inclusion, and where questions about the impartiality of a juror cannot be resolved with certainty, or in marginal cases, the questionable juror should be excused.

## B. General Jury Selection Standards

"In Kentucky, the right to an impartial jury is protected by Section 11 of the Kentucky Constitution, as well as the Sixth and Fourteenth Amendments to the [United States] Constitution." *Fugett v. Commonwealth*, 250 S.W.3d 604, 612 (Ky. 2008); *see also Fugate v. Commonwealth*, 993 S.W.2d 931, 939 (Ky.1999). "RCr 9.36(1) provides that the trial judge shall

10. *See, e.g., Fugett v. Commonwealth*, 250 S.W.3d 604 (Ky.2008) (juror who believed police officers had greater credibility and who believed that punishment should not be based on *mitigating factors should have been excused for cause); *Gabbard v. Commonwealth*, 297 S.W.3d 844 (Ky.2009) (juror, who had specifically stated that she had formed an opinion about the case and that she had made up her mind and she thought defendant was guilty, should have been struck for cause); *McDaniel v. Commonwealth*, 341 S.W.3d 89 (Ky.2011) (juror who had worked with the victim's wife, and another who had worked with the victim, and liked him—"neither of

whom could say unequivocally that they could be fair and impartial in their deliberations[,]" should have been struck for cause); *Steitz v. Commonwealth*, 2009 WL 3526655 (Ky.2009) (prospective juror who had been sexually molested as a child was subject to removal for cause in prosecution for sex crimes); *Cf. King v. Commonwealth*, 276 S.W.3d 270 (Ky.2009) (trial court erred by failing to strike for cause a potential juror who was married to a law enforcement officer and, along with her husband, a friend of the lead detective in defendant's case; because the jurors the defendant would have struck, ultimately did not serve on the jury, the error was harmless).

excuse a juror [for cause] when there is reasonable ground to believe that the prospective juror cannot render a fair and impartial verdict." *Smith v. Commonwealth*, 734 S.W.2d 437, 444 (Ky.1987). We have "long recognized that 'a determination as to whether to exclude a juror for cause lies within the sound discretion of the trial court, and unless the action of the trial court is an abuse of discretion or is clearly erroneous, an appellate court will not reverse the trial court's determination.'" *Fugett*, 250 S.W.3d at 613 (quoting *Pendleton v. Commonwealth*, 83 S.W.3d 522, 527 (Ky.2002)); *see also Soto v. Commonwealth*, 139 S.W.3d 827, 848 (Ky.2004). That determination, however, "is based on the totality of the circumstances, [and] not on a response to any one question." *Fugett*, 250 S.W.3d at 613. This must be so where "the duty of the trial court [is] 'to evaluate the answers of the prospective jurors in context and in light of the juror's knowledge of the facts and understanding of the law.'" *Id.* (quoting *Stopher v. Commonwealth*, 57 S.W.3d 787, 797 (Ky.2001)).

▆▆▆ If an abuse of discretion is found in failing to strike a juror for cause, the trial court will not be reversed unless "the party had to use a peremptory challenge to strike the juror and, in fact, used all his peremptory challenges[.]" *Id.* (citing *Stopher*, 57 S.W.3d at 796). We have held that this requirement exhausting one's peremptory challenges "is predicated on the idea that peremptory strikes are a substantial right given to the defendant" because, "if the defendant had to use all of his peremptory strikes to remove a juror that should have been stricken for cause, a juror that he otherwise would have stricken would have been impaneled on the jury." *King v. Commonwealth*, 276

S.W.3d 270, 279 (Ky.2009) (citing *Shane v. Commonwealth*, 243 S.W.3d at 341). For this reason, "the jury could never be completely fair to the defendant since he was not able to effectively exercise his right to choose jurors." *Id.*

▆▆▆ The established "test for determining whether a juror should be stricken for cause is 'whether ... the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict.'" *Thompson v. Commonwealth*, 147 S.W.3d 22, 51 (Ky.2004)[11] (quoting *Mabe v. Commonwealth*, 884 S.W.2d 668, 671 (Ky.1994)). Where such a showing has been made, "[t]he court must weigh the probability of bias or prejudice based on the entirety of the juror's responses and demeanor." *Shane*, 243 S.W.3d at 338.

## C. Denial of Defense Challenges for Cause

Appellant contends that the trial court erred by denying his request to strike Jurors 5091, 5132, 5303, 5256, 5199 for cause. We need, however, to discuss only one of these jurors in detail, Juror 5091. The failure to excuse Juror 5091 was reversible error. Arguably, the other issues are moot because they are unlikely to recur upon retrial. Nevertheless, as guidance to the bench and bar, we also briefly note these other juror issues.

### 1. Juror 5091

▆▆▆ The refusal to strike Juror 5091 for cause well illustrates how trial courts have failed to heed our recent rulings emphasizing the importance of excusing doubtful jurors for cause. Here, the sister of Juror 5091 was the Victim's Advocate working in close cooperation with the

---

11. *Superseded by statute on other grounds as recognized in Jackson v. Commonwealth*, 363 S.W.3d 11 (Ky.2012).

Commonwealth's Attorney's office, and assigned to aid, assist, and comfort the family members of the deceased victims *in this very case.* Generally, the victim's advocate in a criminal case tends to be viewed as favoring, on the victim's behalf, retribution against the defendant, and thus is generally allied with the interests of the prosecutors; the victim's advocate functions as a liaison between the victim's family and the prosecutors. This close association by a prospective juror's sister with an important participant in *the very case being tried* compels that the juror be stricken for cause. *See King,* 276 S.W.3d 270.

### 2. Jurors 5132, 5303, 5256, and 5199

Appellant sought to strike for cause Jurors 5132, 5303, 5256, and 5199. We review each of those challenges below.

■ Appellant challenged Juror 5132 for cause because of the "tone" he exhibited during *voir dire,* which defense counsel interpreted as a "disdain" for the defense and a lack of civility toward defense counsel. Nevertheless, the substance of this juror's responses reveals no disqualifying bias and the trial court was unconvinced that the juror's attitude demonstrated such a bias. This kind of vague distrust of a juror, unsupported by evidence of a genuine lack of impartiality, is exactly the kind of concern for which peremptory challenges are provided. We see no error in the refusal to strike Juror 5132 for cause.

■ While Juror 5303 exhibited some lack of knowledge regarding what mitigating factors are, and was unable to name any, she nevertheless stated that she would follow the instructions and consider both mitigating and aggravating factors. We see no error in the refusal to strike Juror 5303 for cause.

■ Defense counsel moved to strike Juror 5256 because in response to a hypo-thetical question he indicated that the death penalty would be "appropriate" where the crime was intentional. Upon additional questioning, however, the juror indicated that he could, for the same hypothetical crime, consider all penalties. We see no error in the refusal to strike Juror 5256 for cause.

■ Juror 5199 indicated that as he grew older his view towards crime had tended toward "an eye for an eye" but he added that he would consider the full range of penalties and would consider both aggravating and mitigating circumstances. We see no error in the refusal to strike Juror 5199 for cause.

Our review persuades us that the trial court properly exercised its discretion in denying Appellant's motions to strike each of these jurors for cause.

### D. Jurors Excused For Cause

Appellant argues that the trial court improperly excused, at the Commonwealth's request, a number of jurors for cause.

### 1. Juror 5513 and the issue of Race

■ Juror 5513 is an African–American college professor. Appellant and the two victims are also African–Americans. When asked whether the race of Appellant or the victims would be a factor in her deliberations, Juror 5513 responded that "it might." She elaborated, "I'm not exactly sure why. I just know that race affects a lot of different things in our society and so it's possible depending on the evidence and the circumstances and the situations, that it could, you know, play a role. It would just depend on the facts of the case, I guess." She further expressed concern about the number of incarcerated African–American males, stating, "I mean, just from what I know about race and the judicial system, I know that there are a lot of African–American males

who are in the judicial system or prison or on trial and that kind of thing, and I mean...."

In excusing this juror the trial court noted: "And the reason we ask the race question, because we could get this response or the response of the lady yesterday with respect to race, they're opposite ends of the spectrum, and what I don't want is some kind of nullification based solely on race, and that's sort of what I was hearing from 'they're a lot of African–American males in the judicial system and in prison.' "

The rate of African–American incarceration that Juror 5513 mentioned is, of course, a significant sociological issue of serious concern to many. That Juror 5513 shared that concern is certainly not a disqualification; but what obviously caught the attention of the trial court was the juror's acknowledgement that race "might" play a role in her deliberations. From that response, the trial court sensed an unreasonable risk that the Appellant's race would be a factor affecting that juror's judgment. In other words, there were reasonable grounds to believe the juror would not be impartial. The trial court did not abuse its discretion in striking her for cause. Moreover, we note that this strike is a good example of faithfulness to our *Shane* cases from the angle favoring the Commonwealth. Accordingly, we discern no error in excusing Juror 5513.

### 2. Other Jurors Excused for Cause

Appellant also contends that Jurors 5369, 5493, 5383, and 5336 were erroneously excused for cause based upon the indication that they had views which would interfere with their ability to impose the death penalty in this case.

Juror 5369 was from India; he stated that based upon his Ghandistic [12] philosophy he would "not be able to support the death penalty in that circumstance, the one you describe."

Juror 5493 stated that she was "strongly against" the death penalty and that she could not envision a set of facts or circumstances under which she could impose the death penalty.

Juror 5336 stated that for religious reasons he would automatically exclude the death penalty and that there were no circumstances under which he could impose the death penalty.

And finally, Juror 5383 stated in his juror questionnaire that he wanted nothing to do with a murder case; that he did not like to be judged and did not like to judge others "in any shape or form"; and that if selected for service he would "do as instructed" to avoid stress. The trial court construed this to mean that the juror was inclined to "go along with" or defer to the judgment, of other jurors, instead of his own, in order to avoid stress.

Because the first three jurors all expressed a categorical unwillingness to impose the death penalty and Juror 5369 expressed an ill-suited preference to avoid stress in his deliberations, the trial court properly exercised its discretion in electing to exclude each of these jurors for cause.

### E. Denial of Batson Challenges Regarding Jurors 5109 and 5131

Appellant complains that the trial court erred by striking Jurors 5109 and 5131 for cause over his *Batson* objection.

In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) the Unit-

---

**12.** Referencing Mahatma Mohandas K. Gandhi's famous philosophy of pacifism and non-violence.

ed States Supreme Court prohibited deliberate racial discrimination during jury selection. Under *Batson*, we have explained:

> [a] three-prong inquiry aids in determining whether a prosecutor's use of peremptory strikes violated the equal protection clause. Initially, discrimination may be inferred from the totality of the relevant facts associated with a prosecutor's conduct during a defendant's trial. The second prong requires a prosecutor to offer a neutral explanation for challenging those jurors in the protected class. Finally, the trial court must assess the plausibility of the prosecutor's explanations in light of all relevant evidence and determine whether the proffered reasons are legitimate or simply pretextual for discrimination against the targeted class.

*McPherson v. Commonwealth*, 171 S.W.3d 1, 3 (Ky.2005) (footnotes omitted).

 "[T]he trial court's ultimate decision on a *Batson* challenge is akin to a finding of fact, which must be afforded great deference by an appellate court." *Chatman v. Commonwealth*, 241 S.W.3d 799, 804 (Ky.2007). " 'Deference,' of course, does not mean that the appellate court is powerless to provide independent review, *Miller–El v. Dretke*, 545 U.S. 231, 240, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (holding that the trial court's finding of non-discrimination was erroneous in light of clear and convincing evidence to the contrary), ... but the ultimate burden of showing unlawful discrimination rests with the challenger." *Rodgers v. Commonwealth*, 285 S.W.3d 740, 757–58 (Ky.2009). "A trial court's ruling on a *Batson* challenge will not be disturbed unless clearly erroneous." *Washington v. Commonwealth*, 34 S.W.3d 376, 380 (Ky.2000).

Here Juror 5109 failed to disclose on her juror questionnaire that she had two prior convictions, one involving possession of marijuana and the other for passing a "cold check." She also failed to disclose that she worked for a criminal defense law firm that was practicing criminal cases in Fayette County. Similarly, Juror 5131 failed to disclose on his juror questionnaire that he had prior criminal convictions for carrying a concealed deadly weapon and fourth degree assault.

 In response to Appellant's *Batson* challenge, the Commonwealth stated that it struck all prospective jurors who had criminal convictions that were not disclosed on their juror questionnaire forms, and that in this case, two Caucasian jurors were also struck for the same reason. Obviously, lying on a juror questionnaire form provides a valid and race-neutral reason for excluding a prospective juror by peremptory strike. That two Caucasian jurors were struck for the same reason negates the concern that striking Jurors 5109 and 5131 was racially motivated. We find no *Batson* violation in their exclusion from the venire.

### F. Limitations on *Voir dire*

 In his final issue relating to jury selection matters, Appellant contends that the trial court improperly limited his *voir dire* examination of Juror 5531 and Juror 5104. "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Fields v. Commonwealth*, 274 S.W.3d 375, 393 (Ky.2008)[13] (quoting *Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992)). However, "it is within the trial court's discretion to limit the scope of voir dire." *Id.* (citing *Webb v. Commonwealth*, 314 S.W.2d 543, 545 (Ky.1958)). And, appellate review of

---

13. *Overruled on other grounds by Childers v. Commonwealth*, 332 S.W.3d 64 (Ky.2010).

such a limitation is one for an abuse of discretion. *Hayes v. Commonwealth,* 175 S.W.3d 574, 583 (Ky.2005). The crucial inquiry is not whether a particular question should have been permitted, but whether denial of that question implicates fundamental fairness. *Lawson v. Commonwealth,* 53 S.W.3d 534, 540 (Ky.2001). Against the foregoing principles, we weigh Appellant's claim whether the limitations imposed upon the *voir dire* examination unreasonably fettered his effort to secure a fair jury.

### 1. Juror 5531

▮ Juror 5531 is a Caucasian individual. Appellant asked him about his interactions with African–Americans, and whether he believed they were subject to racism in our society. Defense counsel asked "When it is time to think about what we're here for, the criminal justice system, in your opinion is there any sort of disproportionate number of African–Americans subject to...." The question was interrupted by the Commonwealth's objection. At the bench, it was made clear that counsel was attempting to ask about the disproportionate rate of African–American incarceration.

### 2. Juror 5104

▮ Juror 5104 was asked about the appropriateness of the death penalty in a hypothetical case where the jury convicted the defendant of intentional murder, found an aggravator, and there was no defense to the crime. Juror 5104 stated that she could not answer the question without hearing all of the evidence, although she did believe that there were cases where the death penalty was appropriate. Defense counsel then asked the Juror to explain more about the type of evidence she

would need to hear to make that decision. The Commonwealth objected, arguing that the point of individual *voir dire* was to make sure jurors could consider the full range of penalties, not to find out what a juror needed to hear to make that decision. The trial court sustained the objection.

We conclude, with respect to Juror 5104, that it was within the trial court's proper discretion to limit defense counsel's *voir dire* question about the specific evidence she would need in order to make her decision about whether to impose the death penalty. *Harris v. Commonwealth,* 313 S.W.3d 40, 47 (Ky.2010) ("There is no entitlement ... to a jury or to individual jurors committed at the outset to view particular mitigating factors as having a mitigating effect.").

The proposed questioning of Juror 5531 is more problematic.[14] The trial court allowed inquiry into Juror 5531's experience with African–Americans and racism, but cut off the questions when the inquiry began to focus on the disproportionate incarceration of African–Americans. Given our discussion, above, of Juror 5513's disqualification because of her concern for that social issue, it is obvious that the counsel's line of inquiry might have disclosed a similarly disqualifying bias. Accordingly, we conclude that the trial court abused its discretion, under the circumstances present here, by so limiting counsel's *voir dire* examination.

## VII. PROSECUTOR'S COMMENTS REGARDING "WEIGHING" AGGRAVATING AND MITIGATING FACTORS

Appellant contends that error occurred when, during *voir dire,* the prosecutor said

---

14. We highlight here the similarity in the identification numbers assigned to Juror 5531 and Juror 5513, and the fact that the issues of

each juror involved race, to assist the reader and to avoid confusion.

to prospective jurors that they would be required "to make a determination of whether or not the aggravating circumstances in this case ... outweighed any mitigating circumstances before you fix[ ] the penalty"; and "in order to ultimately consider the maximum penalties, you would have to find that the evidence of the aggravating circumstances outweighed the [mitigating circumstances]." Appellant objected to these statements on the basis that they implied that if the aggravating circumstances "outweighed" the mitigating factors, then the jury should give death, and that to impose a penalty less than death, the mitigators must outweigh the aggravators. The trial court overruled the objection, but the Commonwealth did not repeat the statement. Because the issue may recur upon retrial, we elect to address this issue.

Appellant contends that the comments of the prosecutor during *voir dire* misstated Kentucky's statutory death penalty scheme, which is modeled on the 'threshold' statute upheld by the U.S. Supreme Court in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). He contends that "[b]ecause Kentucky is not a weighing state, a jury can reject a death sentence for any (or no) reason at all." For the reasons explained below, we agree.

At the outset, we note that the words "weigh" or "outweigh" are not part of our death sentence statute. KRS 532.025(2) requires that the fact finder "shall **consider** ... any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the following statutory aggravating or mitigating circumstances which may be supported by the evidence...." (emphasis added). We briefly addressed the issue of a jury's function in considering aggravating circumstances in comparison with mitigating factors in *Sanders v. Commonwealth*, wherein we explained as follows:

> Under KRS 532.025(2), a sentencing jury is directed to give consideration to mitigating circumstances, as well as aggravating circumstances, supported by the record. Upon a finding beyond a reasonable doubt of the existence of an aggravating circumstance, the jury *may* fix the penalty at death. We may only conclude that the statute contemplates that the jury **will weigh the mitigating circumstances in the process of arriving at an appropriate penalty**. Upon review, we consider not only whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant, but also whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. KRS 532.075(3)(a) and (c). This procedure, **without requiring an express "weighing" of aggravating versus mitigating circumstances,** effectively preserves a defendant's eighth amendment guarantees. *See Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Skaggs v. Commonwealth*, Ky., 694 S.W.2d 672 (1985);[15] *Smith v. Commonwealth*, Ky., 599 S.W.2d 900 (1980).

801 S.W.2d 665, 682–83 (Ky.1990) (emphasis added).

 In large part, this allegation of error is an argument of semantics. Our use of the word "weigh" does not suggest that a quantitative or qualitative comparison must be done of aggravating vs. mitigating factors. It is simply a synonym for the word used in the statute: "consider." As illustrated by our discussion in *Sanders*, because both aggravating and mitigat-

---

**15.** *Opinion Amended and Superseded by* *Skaggs v. Parker,* 235 F.3d 261 (6th Cir.2000).

ing factors are presented to the jury during the penalty phase of the case, it is anticipated that the jury will consider, or "weigh," the significance of these factors in arriving at its sentencing decision. But, the statute does not bind the jury to a specific result as a consequence of its quantitative and/or qualitative comparison of such factors. Under the statute, the jury need not impose death even if it viewed the aggravating circumstances as "outweighing" the mitigating factors. And, so long as the jury finds the presence of least one of the statutory aggravating factors, it may impose the death penalty regardless of the "weight" it assigns to any mitigating factors. *See Thompson,* 147 S.W.3d 22 at 49–50 ("[A] burden of proof instruction regarding the existence of aggravating circumstances and that such factors must outweigh the mitigating factors is not required under Kentucky law where the jury has been otherwise properly instructed to weigh the evidence. An instruction requiring that the aggravators outweigh the mitigators beyond a reasonable doubt is also not required under Kentucky law.").

Upon retrial, the Commonwealth should not imply to jurors that there is a specific formula for weighing aggravating and mitigating circumstances to be applied in its sentencing decision, or that there is any sort of implication that if the aggravating factors outweigh the mitigating factors then a death penalty is necessarily the favored penalty.

## VIII. INTRODUCTION OF APPELLANT'S PHONE CONVERSATION

■ Appellant next argues that the trial court erred by admitting a portion of a telephone conversation between him and a friend, recorded a few months after the shooting, while Appellant was incarcerated in the Fayette County jail. Appellant as-

serts that the conversation was irrelevant pursuant to KRE 401 and unduly prejudicial pursuant to KRE 403. The recording disclosed the following conversation:

> **Friend:** Who were them niggas (inaudible) that try to do you?
>
> **Appellant:** Um, that nigga Lee Lee and nigga Hot Rod.
>
> **Friend:** Never heard of them (inaudible).
>
> **Appellant:** Should have seen their faces . . . (laughter).

The Commonwealth argued that the phone conversation refutes Appellant's opening statement claim that he did not know Lewis before the day of the shootings, and shows that it was Turner and Lewis, not Appellant, who were taken by surprise during the events.

To be admitted at trial, the evidence must be relevant. KRE 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. Even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403; *Moorman v. Commonwealth,* 325 S.W.3d 325, 332–33 (Ky.2010).

The recorded conversation lends credence to the two points proffered by the Commonwealth. First, it shows Appellant referring to the two victims to his friend, matter-of-factly, by their nicknames in a manner that suggests his familiarity with them, even if his friend was not. Second, and perhaps more importantly, Appellant's statement, "you should have seen their faces," implies that the two victims were surprised at the turn of events immediate-

ly prior to, and during, the shootings. One could therefore reasonably infer from this statement that Appellant was the initial aggressor who surprised the victims, rather than the other way around. Proof that the victims were surprised was also relevant even under Appellant's version of events, in which he adeptly seized the weapons and turned the tables on his putative attackers.

Accordingly, the trial court did not abuse its discretion by permitting the Commonwealth to introduce the phone call, and the evidence may therefore be used again upon retrial.

### IX. ALLEGATION OF BRADY VIOLATION REGARDING RECORDER IS MOOT

As mentioned above, a recording device was found in the center console of the vehicle and it contained a voice recording that Appellant contends was exculpatory. The Commonwealth, which failed to disclose in a timely manner the existence of the recording, interprets the recording as merely inaudible noise with a television playing in the background. When, at trial, Appellant discovered that there were decipherable words recorded on the device, he moved for a mistrial alleging due process violation pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The trial court denied the motion for a mistrial, and instead declared a brief continuance to allow defense counsel time to listen to the recording.

Ultimately, and without objection by the Commonwealth, Appellant was permitted to admit into evidence a section of the recording in which someone is heard to say "going to store to get ready in about ten minutes to practice okay, we gonna see if he's gonna cry, we gonna record it. Okay." That voice is followed by a sound that Appellant interprets as the cocking of

a gun, although the Commonwealth disputes that interpretation.

Because we have reversed upon other grounds and Appellant now has access to the recording, the *Brady* and mistrial issues are moot. Before retrial, Appellant will have a full opportunity to analyze and investigate the evidence, and introduce it at trial subject to the applicable Rules of Evidence.

### X. ELICITING OF TESTIMONY RE-GARDING TRUTHFULNESS OF APPELLANT'S TESTIMONY

During its rebuttal case the Commonwealth called an ex-girlfriend of Turner's, Jonetta Weaver, who was also a friend of Lewis. Weaver testified that Appellant, contrary to his assertions, had "hung-out" with Turner and Lewis for several months prior to the shooting. During the course of her testimony, to this effect, the following exchanges occurred between the witness and the prosecutor:

**Prosecutor:** So, that's a five month period in there from the time that you saw all three of those people in your house together, um, until August when [Turner] was shot and killed?

**Weaver:** Correct

**Prosecutor:** So, if the defendant, Carlos Ordway, says he only knew, uh, [Turner] for a month and a half, **that just wouldn't be correct,** is that right?

**Weaver: That wouldn't be correct.**

. . . .

**Prosecutor:** So if this defendant said that he did not know [Lewis] would that be true?

**Weaver: That would not be true.**

Appellant contends that Weaver's testimony characterizing as "not true" and "not correct" his claim to have known Turner for only a month and a half, and not to have known Lewis at all until the day of

the shooting, was in violation of the basic rule that one witness may not be asked to characterize the testimony of another witness as a "lie."

 "[I]t is generally improper for a witness to characterize the testimony of another witness as 'lying' or otherwise." *Lanham v. Commonwealth*, 171 S.W.3d 14, 23 (Ky.2005); *see also Moss v. Commonwealth*, 949 S.W.2d 579, 583 (Ky.1997) ("A witness should not be required to characterize the testimony of another witness ... as lying."). "With few exceptions, it is improper to require a witness to comment on the credibility of another witness. A witness's opinion about the truth of the testimony of another witness is not permitted. Neither expert nor lay witnesses may testify that another witness or a defendant is lying or faking. That determination is within the exclusive province of the jury." *Moss*, 949 S.W.2d at 583 (quoting *State v. James*, 557 A.2d 471, 473 (R.I.1989)); *see also Hall v. Commonwealth*, 337 S.W.3d 595, 602 (Ky.2011).[16]

Of course, RCr 9.42(e) provides for rebuttal testimony and it is self-evident that rebuttal testimony elicited by the prosecutor is often intended to establish that the defendant's version of events "wouldn't be correct" and "would not be true." That is the function of rebuttal evidence. However, that function can be served without paraphrasing the prior testimony and calling upon the rebuttal witness to give his opinion as to the veracity of the testimony. By use of fundamental witness examination skills, a party may successfully impeach the testimony of a witness and thereby demonstrate that the witness was either lying or mistaken, without violating the rule under discussion. Here, for example, the prosecutor could have simply elicited Weaver's testimony on the disputed fact and completed the impeachment during closing arguments by pointing out the conflicting testimony to the jury, with his argument explaining why the jury should accept Weaver's testimony over Appellant's.

 The rebuttal witnesses' role is to proffer evidence that refutes fact asserted by prior testimony, not to give an opinion on the accuracy, correctness, or veracity of another witness. Weaver's testimony violated the rule. Accordingly, upon retrial the Commonwealth may again impeach Appellant's statement about how long he knew the victims through Weaver's testimony, but should avoid having Weaver characterize the Appellant's version.

## XI. EVIDENCE OF APPELLANT'S ATTEMPT TO ENTER VEHICLES AFTER THE SHOOTINGS

 Appellant contends that evidence of his two attempts to hale a vehicle in the immediate aftermath of the shooting could be construed as attempted car-jacking, and was, therefore, improperly admitted as un-

---

**16.** An unpreserved *Moss* violation is sometimes reviewed not as a trial court error but as a form of alleged prosecutorial misconduct as explained in *Duncan v. Commonwealth*, 322 S.W.3d 81, 87 (Ky.2010):

[p]rosecutorial misconduct can assume many forms, including improper questioning and improper closing argument. *Brown v. Commonwealth*, 313 S.W.3d 577 (Ky.2010); *State v. Singh*, 259 Conn. 693, 793 A.2d 226 (2002). If the misconduct is objected to, we will reverse on that ground

if proof of the defendant's guilt was not such as to render the misconduct harmless, and if the trial court failed to cure the misconduct with a sufficient admonition to the jury. Where there was no objection, we will reverse only where the misconduct was flagrant and was such as to render the trial fundamentally unfair. *Barnes v. Commonwealth*, 91 S.W.3d 564 (Ky.2002); *Partin v. Commonwealth*, 918 S.W.2d 219 (Ky.1996).

Upon application of this standard our result would be the same.

duly prejudicial, pursuant to KRE 403, and as inadmissible other bad acts under KRE 404(b) and in violation of KRE 404(c)'s notice requirement. Although he claimed he was merely trying to get help, Appellant's effort to enter the two occupied vehicles is easily construed as something far more sinister: namely, the attempted theft of an automobile and possibly the unlawful imprisonment or kidnapping of its occupants.

We conclude that, despite the prohibitions of KRE 404(b), the evidence under discussion here is plainly admissible because it fits comfortably within two exceptions provided in KRE 404(b). First, as evidence of an effort to avoid arrest, it is admissible for a purpose other than the character of the accused. KRE 404(b)(1). Second, KRE 404(b)(2) provides for admission of evidence of bad acts that are "inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party."

■■■ If nothing else, the two separate attempts to gain entry into the other vehicles suggests an attempt to flee before police arrived. It has long been held that proof of flight to elude capture or to prevent apprehension is admissible because "flight is always some evidence of a sense of guilt." *Hord v. Commonwealth*, 227 Ky. 439, 13 S.W.2d 244, 246 (1928). This common law rule is based on ordinary human experience that echoes its often-quoted Biblical antecedent: "The wicked flee where no man pursueth; but the righteous are bold as a lion." Proverbs 28:1; *see also Rodriguez v. Commonwealth*, 107 S.W.3d 215, 218–19 (Ky.2003). "By definition, the common law rule regarding the admissibility of evidence of flight is a rule of relevancy. That is, evidence of flight is admissible because it has a tendency to make the existence of the defendant's guilt more probable: a guilty person probably would act like a guilty person." *Rodriguez*, 107 S.W.3d at 219. Therefore, the evidence was admissible to prove a relevant fact in controversy and was not offered to prove Appellant's bad character or behavior consistent with bad character. KRE 404(b)(1).

In addition, the testimony describing Appellant's actions immediately after the crash is so inextricably intertwined with the shooting itself, that it is essential to a full and fair understanding of what happened. KRE 404(b)(2). As Professor Lawson points out, the words of KRE 404(b)(2) ("inextricably intertwined with other evidence essential to the case") "are designed to be flexible enough to permit the state to present a complete and realistic picture of the crime committed by the defendant, including necessary context ... and perspective." Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 2.25[4][b] (4th ed.2003).

> One of the accepted bases for the admissibility of evidence of other crimes arises when such evidence "furnishes part of the context of the crime" or is necessary to a "full presentation" of the case, or is so intimately connected with and explanatory of the crime charged against the defendant and is so much a part of the setting of the case and its "environment" that its proof is appropriate in order "to complete the story of the crime on trial by proving its immediate context [ ]."

*Norton v. Commonwealth*, 890 S.W.2d 632, 638 (Ky.App.1994); *see also Webb v. Commonwealth*, 387 S.W.3d 319 (Ky.2012).

The witnesses' descriptions of Appellant's conduct in the aftermath of the shooting provided as much context for the actual shooting as did the events in the car immediately before the shooting. It is difficult to conceive how the events that

immediately followed the shooting could be omitted without impairing the jury's ability to understand the whole event. Jurors, tasked with the grave responsibility of a death-penalty case to determine exactly what happened must be able to obtain a clear and accurate picture of the entire event.

Of course, even relevant and otherwise admissible evidence must be excluded when its probative value is outweighed by the "danger of *undue* prejudice." KRE 403 (emphasis added). Obviously, coupled with the inadmissible opinion of Detective Wilson that innocent people "certainly don't leave the scene" and "they don't try to commandeer vehicles," the events that occurred right after the shootings may have exposed Appellant's case to substantial undue prejudice. However, upon retrial, with the elimination of that improper evidence, the risk of undue prejudice is dissipated. We therefore conclude that the evidence of Appellant's attempts to enter other vehicles is admissible on retrial.

Appellant also claimed that he was prejudiced by the failure of the Commonwealth to comply with the notice provisions of KRE 404(c):

> In a criminal case, if the prosecution intends to introduce evidence pursuant to subdivision (b) of this rule as a part of its case in chief, it shall give reasonable pretrial notice to the defendant of its intention to offer such evidence. Upon failure of the prosecution to give such notice the court may exclude the evidence offered under subdivision (b) or for good cause shown may excuse the failure to give such notice and grant the defendant a continuance or such other remedy as is necessary to avoid unfair prejudice caused by such failure.

Because the evidence we discuss herein was introduced by the Commonwealth "pursuant to subdivision (b) of [KRE 404] as part of its case in chief," the notice provision expressly applies. The failure to give notice, if indeed Appellant was unaware of the substance of that evidence, was improper. Upon retrial, if the Commonwealth again elects to introduce the evidence, it must comply with the reasonable notice requirements of KRE 404(c).

## XII. APPELLANT'S RENTAL OF A MOTEL ROOM

■■■ Appellant next contends that the trial court erred by permitting the Commonwealth to introduce, over his objection, evidence that he rented a motel room in Lexington five days before the shooting. He argues that the evidence is irrelevant; however, he does not clearly identify any prejudice associated with the evidence. The Commonwealth theorized that Appellant, Turner, and Lewis were traveling from the motel room to Turner's cousin's residence when the shooting occurred, and thus the rental of the room was an important detail relevant to the jury's understanding of the sequence of events leading up to the shooting.

The evidence was properly admitted. Keys to the room were found on both Appellant and Turner, a fact that demonstrates a reasonably close relationship because they were sharing a motel room. Evidence regarding the relationship between the defendant and the victim is relevant and admissible. *Lear v. Commonwealth*, 884 S.W.2d 657 (Ky.1994).

Appellant complains that the motel room evidence "forced" him to testify about how he and Turner drove to Louisville to buy drugs and then rented the room to do the drugs; however, that is not correct. In fact, Appellant did not have to volunteer the details regarding the drug buy in Louisville and of their drug use in the motel room. He could have simply indi-

cated that he rented the room because he needed a place to stay, and that Turner stayed with him because he did too. Therefore, the evidence may again be admitted upon retrial.

## XIII. IMPROPER USE OF SUBPOENAS

■ Appellant next contends that error occurred because the subpoenas issued to some of the witnesses in this case included a request, stamped in red ink, "PLEASE CALL THE ATTORNEY UPON RECEIPT OF THIS SUBPOENA AT 246–2060." The phone number is for the Fayette County Commonwealth's Attorney's office. Appellant alleges that the stamped request "had a chilling effect on witnesses, and aligned all witnesses with the prosecution and against the defense." He further alleges that the request caused some of the witnesses to refuse to talk with defense counsel.

The trial court concluded that there was no prosecutorial misconduct or bad faith associated with the message stamped on the subpoenas, and that it was unlikely that stamp on the subpoena, which has apparently been a common local practice for many years, had any prejudicial effect upon Appellant's ability to present a defense. We are not persuaded by any of Appellant's arguments that this practice should be prohibited. The standard subpoena form promulgated by the Administrative Office of the Courts has a space in which contact information for the requesting attorney is to be inserted. Highlighting such information with a red stamp only displays more prominently that same information for witnesses subpoenaed by the Fayette County Commonwealth's Attorney. We do not endorse the practice, but we are unable to discern any detrimental effect of its use, nor do we conclude that it infringed upon any rights of Appellant, or

otherwise burdened his defense. Therefore, we affirm the trial court's disposition of this matter.

## XIV. THE MISSING EVIDENCE

■ During the autopsy of Lewis, five baggies of what appeared to be crack cocaine fell out of his pocket. Tests revealed that the items were not crack cocaine; they were fleece, or fake crack cocaine. The testing was done at the lab of the Kentucky Medical Examiner's office, which during the pretrial stage of this case, was consolidated with the Kentucky State Police Central forensic lab. During the consolidation of the two labs, the substance found in Lewis's pocket was lost.

Appellant moved to preclude the Commonwealth from mentioning that the substance was actually fake crack cocaine upon the grounds that the evidence was lost while in the hands of the Commonwealth, and that it was unavailable for testing by the defense's own experts. He also argued that a breach in the chain of custody prior to testing also rendered it inadmissible. In the alternative he requested a missing evidence instruction. He argued to the trial court that he believed that the substance was genuine cocaine that Lewis and Turner had stolen from him. As such, the evidence would have supported his claim that the victims robbed him, and that he killed them in self-defense. He accordingly argues that the loss of the evidence was highly prejudicial.

The trial court denied all of Appellant's requested remedies and permitted the Commonwealth to introduce evidence that the substance found in Lewis's pocket was fake crack cocaine. The court noted that there was no bad faith in the loss of the evidence; that Appellant could make his arguments that the substance was real cocaine from the photographs that were

taken of it; and that any chain of custody problems went to the weight of the evidence not its admissibility. Appellant's claim of prejudice falls short. The essence of his defense is that the victims were attempting to rob and kill him. It makes no difference whether the crack was real or fake since, presumably, neither Appellant nor the victims knew at the time of the alleged robbery that it was not real. He demonstrates no prejudice from the loss of that evidence.

 The missing evidence instruction should be given when material evidence within the exclusive possession and control of a party, or its agents or employees, was lost without explanation or is otherwise unaccountably missing, or was through bad faith, rendered unavailable for review by an opposing party. When appropriately given, the missing evidence instruction allows the jury, upon finding that the evidence was intentionally and in bad faith destroyed or concealed by the party possessing it, to infer that the evidence, if available, would be adverse to that party or favorable to his opponent. *University Medical Center, Inc. v. Beglin*, 375 S.W.3d 783, 792 (Ky.2012). When it is established that the evidence was lost due to mere negligence or inadvertence, which, in effect, negates a finding of bad faith, the missing instruction should not be given. *Id.* at 791 (citing *Mann v. Taser Intern., Inc.*, 588 F.3d 1291, 1310 (11th Cir.2009)).[17]

Here, the disappearance of the evidence appeared to result from negligence arising out of the consolidation of the two labs. Pursuant to the foregoing rules Appellant

was not entitled to a missing evidence instruction. Accordingly, upon retrial, the fake crack cocaine evidence may be admitted into trial and the missing evidence instruction is not required.

## XV. THE MULTIPLE ASSAILANTS SELF–DEFENSE INSTRUCTION

 Appellant next contends that the trial court erred by denying his request for a multiple assailants self-protection instruction. As previously noted, Appellant testified that Lewis initiated a robbery against him by pointing a gun at his head, and saying "give it up, you know what time it is, or you're going to die," and that Turner then pulled out a gun. Appellant said he believed they were working together. Appellant testified that after he gave them the drugs, and fearing for his life, he turned and knocked the gun out of Lewis's hand and grabbed the gun from Turner's lap, and commenced shooting. Appellant tendered the following instruction:

Even though Carlos Ordway might otherwise be guilty of Murder under Instruction No. _____, or First–Degree Manslaughter under Instruction No. _____. Or Second–Degree Manslaughter under Instruction No. _____, if at the time Carlos Ordway killed Rodriquez Turner and Patrick Lewis, he believed that Patrick Lewis and Rodriquez Turner were acting in concert, and were then and there about to use, or he believed there was an impending danger that Patrick Lewis acting in concert with Rodriquez Turner, would use, physical force upon him, he was privileged to use

17. Other common types of cases where the instruction will not be warranted include loss of evidence as a result of fire, weather, natural disaster, other calamities, or destruction in the normal course of file maintenance, particularly in accordance with industry or regulatory standards. Robert G. Lawson, *The*

*Kentucky Evidence Law Handbook*, § 2.65[3] (4th ed.2003) (An inference based on destruction (or loss) may not be drawn if the destroyer acted inadvertently (mere negligence) or if there is an adequate explanation for the destruction (or loss)).

such physical force against Patrick Lewis and Rodriquez Turner as he believed to be necessary in order to protect himself against it, but including the right to use deadly physical force in so doing only if he believed it to be necessary in order to protect himself from death or serious physical injury or any other felony involving the use of force such as robbery at the hands of Patrick Lewis and Rodriquez Turner.

The trial court declined to give the requested instruction, and instead gave a conventional self-defense instruction which encompassed each of the victims and justified the shootings if Appellant believed that deadly force was necessary to protect himself from each of them *individually.*

In support of his entitlement to the instruction Appellant cites us to *Hayes v. Commonwealth,* 870 S.W.2d 786 (Ky.1993). In *Hayes,* the defendant presented evidence that he was being shot at by one of several persons engaged in a robbery. He returned fire at the shooter, he claims in self-defense, but his bullet hit and killed a different person who the defendant believed was one of the robbers acting in concert with the shooter. Citing *Carnes v. Commonwealth,* 453 S.W.2d 595 (Ky.1970), we held that under such circumstances an instruction on self-defense is erroneous if it does not submit the right of the defendant to protect himself from the deceased and others acting in concert:

> In this situation, under the totality of the circumstances, an argument can be made that the deceased was involved in the robbery of Hayes and was acting in complicity with other robbers who shot at Hayes. Whether Hayes was justified to use self-defense which resulted in the killing of the occupant of the car is a jury question.
>
> It is the holding of this Court that the question of self-protection against multi-

ple aggressors acting in concert, when supported by sufficient evidence, should be given to the jury.

*Hayes,* 870 S.W.2d at 789.

The multiple assailants self-defense instruction serves an important function when there is an uncertain situation in which a person, authorized to act in self-defense, finds it difficult to ascertain exactly who among a number of threatening adversaries poses the immediate threat to his life. A multiple assailants self-defense instruction would have been appropriate in this case. Nevertheless, we believe it was unnecessary here because Appellant's defense was that he believed that both Turner and Lewis had deadly weapons which they attempted to use against him. The conventional self-defense instruction given in this case encompassed both Turner and Lewis as posing threats to Appellant.

According to Appellant's testimony, the victims were acting in concert, but each posed a separate and identifiable threat. There is no allegation, for example, that only Lewis was the threat and Appellant mistakenly believed Turner was in on the plan to rob him at gun point. Therefore, the instruction as given under the circumstances of this case fully presented Appellant's theory of the case as well as his proposed multiple assailants instruction. There was no error in the instruction given, or in the failure to give the multiple assailants instruction.

## XVI. FAILURE TO INSTRUCT ON WANTON MURDER

Appellant next contends that the trial court erred by failing to give an instruction on wanton murder pursuant to KRS 507.020. As the Commonwealth correctly notes, this issue is not properly preserved because trial counsel specifically waived any request for the instruction.

Appellant contends, however, that that waiver was subject to the approval of Appellant, who was not present at the time of the waiver, and the record does not demonstrate his final approval of the waiver. Therefore, we will briefly address the issue.

Intentional murder and wanton murder are the same offense under Kentucky law. KRS 507.020; *see also Schambon v. Commonwealth,* 821 S.W.2d 804, 810 (Ky.1991); *see also Evans v. Commonwealth,* 45 S.W.3d 445 (Ky.2001). However, whereas a finding of intentional murder requires that the defendant's conscious objective to have been to cause the death of the victim, a defendant is guilty of wanton murder when "under circumstances manifesting extreme indifference to human life, he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person." KRS 507.020(1)(b). A person acts wantonly "when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." KRS 501.020(3).

Here, Appellant testified that he intentionally and deliberately shot the two victims in order to protect himself because he believed they were going to kill him in connection with their efforts to rob him. Appellant's version describes a justifiable homicide to prevent the victims from assaulting him with their guns. If true, then he would be entitled to an acquittal. His version of events does not describe wanton conduct, only intentional shootings. It follows that the trial court did not err by rejecting his request for a wanton murder instruction.

If Appellant was mistaken in his belief that he was entitled to shoot the victims in self-defense, and if that mistaken belief was a result of a wanton level of mental culpability, the proper instruction is an imperfect self-defense instruction permitting a conviction for second-degree manslaughter or reckless homicide, not a wanton murder instruction. *See Commonwealth v. Hager,* 41 S.W.3d 828 (Ky. 2001); KRS 503.120. Therefore, upon retrial, if the evidence is the same, Appellant will not be entitled to a wanton murder instruction.

## XVII. IMPROPER CLOSING ARGUMENT BY PROSECUTOR

Appellant next contends that error occurred as a result of improper comments made by the prosecutor during closing arguments. The objected to comments are as follows:

■ A. During his closing arguments defense counsel stated that it seemed that the prosecution team was more interested in winning than in finding the truth, and referred to them as having "tunnel vision." In response to this attack by defense counsel, during his closing arguments, the prosecutor stated:

> Tunnel vision? We're more interested about winning than finding the truth? Let me tell you something, we're governed by the Code of Professional Responsibility. Prosecutors have to seek justice, defense attorneys only have to ... defend their, to defend their client. That's a little different. And to sit here and say we're more interested [in] winning than the truth, is a little offensive to me.

■ It is well-established that the Commonwealth may respond to comments made by defense counsel during closing

arguments; accordingly the Commonwealth was entitled to respond to defense counsel's allegation that "it was focused on winning." Nevertheless, the prosecutor incorrectly stated that defense attorneys are not bound by the Rules of Professional Conduct, thereby suggesting to the jury that they are governed by a lower ethical standard, and should not repeat that error upon retrial.

■ B. Appellant contends that the prosecutor also attempted to, over his objection, shift the burden of proof during its closing arguments. The objected to statements are as follows:

> The evidence, unlike his statement, which is all the evidence he relies on is his statement, and remember that, remember the only evidence that he has presented is his statement.... And what did the defense lawyer say he was going to prove in this case?.... Now let's talk just for a minute about the claim that Hot Rod put a .45 caliber in his lap. Nothing to prove that except what the defendant said. Nothing to prove that.

■ The parties have wide-latitude during closing statements to argue their respective cases, to comment on the evidence and draw reasonable inferences therefrom, and to draw attention to the weaknesses in the opposing party's case. The prosecutor's remark did not imply that the defendant bears the burden of proof to establish his innocence, in contrast to the correct standard that it is the Commonwealth's duty to prove all elements of its charges against the defendant beyond a reasonable doubt.

■ C. Appellant also contends that the prosecutor misled the jury during closing arguments about its ability to test items and again shifted the burden of proof to Appellant by stating:

> [The defense] said Carlos Ordway would like to know what's on some of these things [eg., the recorder]. Well if Carlos Ordway and his defense team wanted to know what was on some of these things, why didn't they, on June 4th, send them off? They could, too. They could too.... You see the defense has just as much access to the Kentucky State Police crime laboratory as the prosecution. They can ask anything they want to be examined by the Kentucky State Police. It's a little disingenuous to say that we hid things from them.

■ This was proper argument. The defense is, in fact, entitled to inspect and test evidence, either through its own experts or by request to the State Police Lab for assistance where applicable. *McGregor v. Hines*, 995 S.W.2d 384, 387 (Ky. 1999) ("a defendant's right to test possible exculpatory evidence is as fundamental to the assurance of due process as is his right to test inculpatory evidence, if not more so."). Nor did these arguments impermissibly shift the burden of proof from the Commonwealth to the defendant.

■ D. Finally, Appellant contends that the prosecutor made an impermissible "send a message to the community" argument during closing statements when he stated as follows:

> If you don't find him guilty beyond a reasonable doubt then he walks right out the door.... How many times have we watched or read the bad news on television or in the paper and shook our heads and thought what are they gonna do? They've got to do something. Well in this case, the "they" is you, the jury, and I always feel compelled to tell jurors this: don't ever let anyone put any of you on a guilt trip about your service as a juror in this sort of a case. You see it's not your fault you're here. It's his fault

you're here. You're not doing one thing to this defendant. This defendant has done it to himself; he's got to be responsible for his behavior in this community.

We have expressed our disapproval of "send a message to the community" arguments such as, for example, "the whole town is depending on you to find the defendant guilty and lock him up for a long time so as to send a message to all the other criminals in the community that this town is not going to put up with this type of criminal activity." *See Carver v. Commonwealth,* 303 S.W.3d 110, 120–21 (Ky. 2010). The comments of the prosecutor clearly strayed into this prohibited area. More specifically, the prosecutor called the jury's attention to the effect that the whole community expected them to do "something" and he left no doubt that what he meant by "something" was to return a guilty verdict. This argument impermissibly urged the jury to consider public opinion, and it correspondingly applied pressure on the jury to satisfy the community expectation. Therefore, upon retrial, the Commonwealth shall refrain from closing arguments of that nature.

## XVIII. ADMISSION OF PRIOR JUVENILE RECORD IN GUILT PHASE

Appellant next contends that error occurred as a result of the Commonwealth's untimely disclosure of its intent to use Appellant's juvenile records during the guilt phase. It appears from the record that the Commonwealth did not give timely notice because the records had been lost by the Jefferson County custodian of the records, and it was unknown whether they would be available for use until the eleventh hour. Because Appellant is now aware of the discovery of the records and the Commonwealth's intent to use them

during the penalty phase upon retrial, we need not further address this issue.

## XIX. KRS 532.055 AND APPELLANT'S PRIOR CONVICTIONS

Appellant next contends that error occurred because the Commonwealth exceeded the scope of KRS 532.055 in informing the jury regarding the background of Appellant's prior convictions.

KRS 532.055(2)(a)(2) permits the Commonwealth, as part of our truth in sentencing process, to inform the jury regarding "[t]he nature of prior offenses for which [the defendant] was convicted." Appellant contends that the Commonwealth exceeded the scope of this provision in this case by reciting portions of the underlying indictments corresponding to the prior convictions; reciting hearsay from police citations, criminal complaints, and other reports and told the jury more than the elements of the offense; and further told the jury that he owed almost $34,500.00 in back child support even though it introduced no evidence of the alleged offense.

In *Mullikan v. Commonwealth,* 341 S.W.3d 99, 109 (Ky.2011), we explained the scope of KRS 532.055(2)(a)2 as follows:

[E]vidence of prior convictions is limited to conveying to the jury the elements of the crimes previously committed. We suggest this be done either by a reading of the instruction of such crime from an acceptable form book or directly from the Kentucky Revised Statute itself. Said recitation for the jury's benefit, we feel, is best left to the judge. The description of the elements of the prior offense may need to be customized to fit the particulars of the crime, i.e., the burglary was of a building as opposed to a dwelling. The trial court should avoid identifiers, such as naming of victims,

which might trigger memories of jurors who may—especially in rural areas—have prior knowledge about the crimes.

We note that *Mullikan* was rendered following the trial in this case. Upon retrial, during the penalty phase, if any, introduction of the nature of Appellant's prior convictions should proceed in accordance with the guidelines as set forth in that decision.

■ Appellant specifically objected to the evidence that he had a delinquent child support obligation. In mitigation several of Appellant's family members testified on his behalf and described his dedication to his family including his two sons, and indicated he would do anything for his children. As such, the evidence to rebut this portrayal of Appellant was admissible. *Hodge v. Commonwealth*, 68 S.W.3d 338, 343 (Ky.2001) (acknowledging that the Commonwealth may introduce rebuttal evidence in the guilt phase of a death penalty case); *Neal v. Commonwealth*, 95 S.W.3d 843, 853 (Ky.2003) (approving of the Commonwealth's use of disciplinary write-ups in the penalty phase as rebuttal to the defendant's use of evidence of rehabilitation as mitigating evidence).

## XX. EVIDENCE ALLEGING APPELLANT'S MALINGERING AND PRIOR MENTAL ILLNESS

■ Appellant argues that the trial court erred by permitting the Commonwealth to present the testimony of Dr. Simon. Dr. Simon was called as a rebuttal witness in the penalty phase of the trial. Simon, who had administered several tests to Appellant at the Kentucky Correctional Psychiatric Center, testified that the tests indicated that Appellant was malingering and faking psychiatric symptoms.

Appellant argues that the rebuttal was improper. We disagree. As part of his

mitigation case Appellant called Dr. Ed Walker of the Jefferson County Juvenile Justice Center who testified that he had treated Appellant for mental health issues, including depression, and had testified on Appellant's behalf at an SSI hearing. Further, Appellant's mother testified that, as a child, Appellant often banged his head against the wall and engaged in other unusual conduct.

Appellant's mitigation testimony clearly strayed into the mental health area. We are therefore persuaded that the trial court did not abuse its discretion in permitting the Commonwealth to introduce the rebuttal evidence. Our conclusion is buttressed by Appellant's own argument in this appeal, discussed below, that he is too mentally ill to be sentenced to death. Upon retrial if Appellant again presents mental health issues in mitigation, the Commonwealth, as limited by the trial court's discretion, will be entitled to present evidence in rebuttal. *Arnold v. Commonwealth*, 192 S.W.3d 420, 425 (Ky.2006) ("[s]ince the results of the Commonwealth's examination are admissible only to rebut the mental health evidence introduced by the defense, Appellant can preclude introduction of the Commonwealth's evidence by declining to assert such evidence on his own behalf.").

## XXI. LACK OF JURY UNANIMITY ON MITIGATING FACTORS

Appellant contends that the mitigating circumstances instruction given in this case is unconstitutional because, when read in context with the instructions as a whole, it improperly required a unanimous jury for any finding of any mitigating circumstances. We addressed a similar argument with regard to similar instructions in *Mills v. Commonwealth*, 996 S.W.2d

473, 492 (Ky.1999),[18] wherein we stated that "[t]he instructions did not imply that unanimity was required on mitigators and there is no requirement that a jury be instructed that their findings on mitigation need not be unanimous." The mitigation instructions in the instant case satisfy this requirement. *See also Hunt v. Commonwealth,* 304 S.W.3d 15, 50 (Ky.2009). We accordingly find no error in the instructions as phrased.

## XXII. PENALTY PHASE INSTRUCTIONS

Appellant next argues that the penalty phase instructions were erroneous because (1) the instructions failed to inform the jury that it could return a sentence of less than death even if it found an aggravating circumstance and did not find the existence of any mitigating factor; (2) the instructions failed to inform the jury that if Appellant was sentenced to death that he would not be eligible for parole and would be killed by lethal injection; (3) the instructions failed to require the jury to make any findings with respect to non-statutory aggravating circumstances even though the Court has held that a death sentence can be based on non-statutory aggravating circumstances, citing *Jacobs v. Commonwealth,* 870 S.W.2d 412, 419 (Ky. 1994); (4) the instructions failed to require the jury to make written findings regarding mitigating circumstances; (5) the instructions failed to include an instruction telling the jury that it could not impose a death sentence based upon passion and prejudice; and (6) the instructions failed to define mitigation, the standard of proof regarding mitigation, or inform the jury that mercy is a proper consideration in reaching its penalty phase verdict.

We have carefully reviewed the instructions in this case and are persuaded that they conform to the requirements of our prior decisions involving death penalty jury instructions. *See, e.g., Skaggs v. Commonwealth,* 694 S.W.2d 672, 680 (Ky. 1985)[19] ("[t]here is no requirement that the jury make written findings on mitigation."); *Mills,* 996 S.W.2d at 492 (there is no requirement that a capital penalty jury be instructed that its findings on mitigation need not be unanimous); *Bussell v. Commonwealth,* 882 S.W.2d 111, 113 (Ky. 1994) (there is no need to instruct the jury that it could impose a life sentence even if it found an aggravating factor beyond a reasonable doubt). Further, it is clearly unnecessary for the instructions to inform a jury that a death row inmate is not eligible for parole or that Kentucky's method of execution is lethal injection.

## XXIII. GRAND JURY REVIEW OF AGGRAVATING CIRCUMSTANCES

Appellant argues that error occurred because the grand jury that returned his indictment did not consider the aggravating circumstances contained in KRS 532.025(3) during the indictment process, and because the indictment failed to identify an aggravating factor, even though the death penalty was sought in this case. He argues that the failure to require the grand jury to consider aggravating factors resulted in a due process violation under both the Federal and Kentucky constitutions.

Under Kentucky law, a person is not eligible to receive the death penalty unless at least one of the statutory aggravators set forth in KRS 532.025(2)(a) is found to apply. *See* KRS 532.025(3) ("In all cases

---

**18.** *Overruled by Padgett v. Commonwealth,* 312 S.W.3d 336 (Ky.2010).

**19.** *Opinion amended and superseded on other grounds by Skaggs v. Parker,* 235 F.3d 261 (6th Cir.2000).

unless at least one (1) of the statutory aggravating circumstances enumerated in subsection (2) of this section is so found, the death penalty, or imprisonment for life without benefit of probation or parole, or the sentence to imprisonment for life without benefit of probation or parole until the defendant has served a minimum of twenty-five (25) years of his sentence, shall not be imposed.").

Appellant's indictment did not describe the aggravators that would render him eligible for the death penalty. Instead, after the indictment, the Commonwealth filed a notice under KRS 532.025 that it was seeking the death penalty. KRS 532.025(1)(a) provides that the Commonwealth may introduce at a capital sentencing hearing "only such evidence in aggravation as the state has made known to the defendant prior to his trial. . . ." That notice set forth the aggravating circumstance of "intentional acts of killing resulting in multiple deaths".

 We have previously rejected the argument a grand jury must identify the specific aggravating factor that qualifies a particular defendant for the death penalty. *See, e.g., Soto v. Commonwealth,* 139 S.W.3d 827, 841–43 (Ky.2004); *Ernst v. Commonwealth,* 160 S.W.3d 744, 752 (Ky.2005) ("Finally, although Appellant argues that the indictment did not set forth the essential elements of the capital kidnapping offense, we also note that the indictment is not required to recite the aggravating circumstance necessary to seek capital punishment so long as the Commonwealth satisfies the notice requirement in KRS 532.025(1)(a)."). We have been shown no compelling reason to depart from our settled position that the indictment need not recite the aggravating

circumstances or, for reasons similar to those as stated above, to impose now a requirement that the aggravating circumstances in a particular case must be presented to the grand jury. *Hunt,* 304 S.W.3d at 54. That said, the aggravating factor of multiple intentional murders was clearly expressed on the face of the indictment even if not specifically identified as an "aggravating factor."

## XXIV. DISQUALIFICATION FROM DEATH PENALTY BY MENTAL ILLNESS

Appellant next contends that he "should not have been sentenced to death because he is mentally ill." Because we have vacated the judgment sentencing Appellant to death, we need not consider this argument in detail. However, upon remand Appellant may pursue whatever challenges he deems appropriate to establish his ineligibility for the death penalty, and to submit whatever admissible evidence he chooses so as to dissuade his next jury from imposing a sentence of death. Upon the record before us, however, we are unable to conclude that the Commonwealth should be precluded from again seeking the death penalty against Appellant for the multiple murders.

## XXV. CONSTITUTIONALITY OF DEATH PENALTY

Appellant contends for various reasons that the death penalty is unconstitutional. However, the constitutionality of the death penalty has been repeatedly recognized. *Thompson v. Commonwealth,* 147 S.W.3d 22, 55 (Ky.2004).[20] Further, KRS 532.025 provides adequate standards to guide a jury in its consideration and imposition of

**20.** *Superseded by statute on other grounds as recognized in Jackson v. Commonwealth,* 363

S.W.3d 11 (Ky.2012).

the death penalty. *Hodge v. Commonwealth,* 17 S.W.3d 824, 854 (Ky.2000). Finally, the death penalty is not imposed arbitrarily or capriciously in Kentucky. *Tamme v. Commonwealth,* 973 S.W.2d 13, 40–41 (Ky.1998); *Meece v. Commonwealth,* 348 S.W.3d 627, 727 (Ky.2011).

Because we have reversed the death penalty herein on other grounds we need not address Appellant's arguments regarding the proportionality of the death penalty in this case nor Appellant's access to this Court's methods of proportionality review.

### XXVI. CONCLUSION

For the foregoing reasons, the Judgment of the Fayette Circuit Court is reversed and the cause is remanded to Fayette Circuit Court for a new trial consistent with the guidance as set forth in this opinion.

MINTON, C.J., ABRAMSON, CUNNINGHAM, NOBLE, SCOTT, JJ., sitting. MINTON, C.J., ABRAMSON and NOBLE, JJ., concur. CUNNINGHAM, J., concurs on all sections but, concurs in result only as to Section X. SCOTT, J., concurs on all sections but, concurs in result only as to Sections IV and X.