# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: AUGUST 26, 2021
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0126-MR

CHRIS JAMES LOWE                                             APPELLANT


ON APPEAL FROM WHITLEY CIRCUIT COURT
V.                    HONORABLE PAUL WINCHESTER, JUDGE
NO. 17-CR-00126


COMMONWEALTH OF KENTUCKY                                     APPELLEE


**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING**

A Whitley Circuit Court jury convicted Chris Lowe (Lowe) of murder, unlawful imprisonment, and tampering with physical evidence. The court sentenced Lowe to life in prison with the possibility of parole. He challenges his conviction on two grounds. First, he argues that that the court abused its discretion by admitting evidence of other wrongful acts in violation of KRE[1] 404(b). Second, he argues that the court erred in allowing the Commonwealth to present victim impact testimony during the guilt phase of the trial. Both arguments are unavailing, and we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On the evening of July 23, 2017, Lowe's uncle Charles noticed a strange scene unfolding in front of Lowe's house. He saw two women, one atop the

---

[1] Kentucky Rule of Evidence.

other, lying in the middle of the road.  As Charles stopped his car, he saw one of the women, whom he believed to be Lori Mattie (Mattie), get off of the other woman and walk toward Lowe's house through the yard.  The other woman, who was subsequently identified as Michelle Marlow (Michelle), remained still.  Upon examining Michelle further, Charles told Lowe that she "didn't look good" and stated that someone needed to call 911.  Lowe responded that Michelle was "asleep" and, with Charles' help, pulled her from the road into the yard.  Upon leaving the scene, Charles returned home and called 911.

Kentucky State Police Lieutenant Tony Dingess responded to the call.  Lt. Dingess immediately noticed blood in the road, driveway, and yard leading toward Lowe's home.  Lt. Dingess followed the blood to the rear of the house and entered.  The blood trail continued inside the home through the kitchen towards a hallway bathroom.  Lt. Dingess looked inside the bathroom and observed more blood and a broken walking stick.  Lt. Dingess continued his sweep of the home until he came upon the master bedroom.  Inside, he found Lowe lying on the bed, naked and covered in what appeared to be blood.  Lt. Dingess attempted to rouse Lowe from the doorway, but Lowe did not respond and appeared to be unconscious.  Lt. Dingess walked further into the master bedroom, at which point he noticed two women.  First, he looked behind him into an adjacent room and saw Michelle, who appeared deceased.  Next, he saw Mattie draped across the toilet in the master bathroom.  Mattie appeared to be unconscious and covered in blood.

Lowe eventually awoke. He clothed himself in a pair of athletic shorts that appeared to be stained with blood and submitted to Lt. Dingess. Upon restraining Lowe, Lt. Dingess examined Michelle. He observed that she had sustained severe head wounds, lacked a pulse, and was not breathing. Lt. Dingess next examined Mattie, who became aggressive upon waking up and had to be secured. Mattie complained of pain in her mouth and vaginal area and was transported to the hospital after emergency services arrived at the scene.

As officers were summoned and began securing the crime scene, another woman, Linda Carpenter (Linda), drove up to the house. Linda told Lt. Dingess that her son, Claude Dean (Claude), asked her to go to the Lowe residence to pick up his girlfriend, Michelle Marlow. Soon thereafter, Lt. Dingess went to the Carpenter residence to speak with Claude. When Lt. Dingess arrived at Linda's house, he observed a white Chevrolet Monte Carlo in the driveway. Further examination of the passenger compartment of the vehicle revealed smears of blood on the steering wheel and driver's side headrest. Inside Linda's home, Claude was passed out on the floor, heavily intoxicated. Lt. Dingess noted small specks of blood on his jeans.

The ensuing investigation revealed a jumbled web of hazy recollections and contradictory tales. All parties, however, agree on certain basic facts. The day before the incident, Lowe, Mattie, Claude and Michelle partied together at Lowe's home. The couples drank a significant amount of beer and liquor and took Xanax throughout the evening. Upon waking up the next morning, Lowe

3

and Claude resumed drinking beer.  At some point, the couples separated. Claude testified that he and Michelle went to eat lunch and run errands before returning to Lowe's house to continue partying.  Claude claimed that upon returning to the house that afternoon, Lowe and Mattie invited them inside but "had the devil in their eyes."  Soon after returning to the Lowe house, Claude said that Mattie began screaming from the bedroom.  Claude overheard Lowe and Mattie discussing a missing wallet and prepared to leave with Michelle. Claude testified that, before he could leave, Lowe emerged from the back bedroom with a shotgun aimed at them.  Lowe and Mattie accused Claude and Michelle of stealing his wallet and, according to Claude, threatened to kill them both if his property was not returned.

Lowe eventually put the shotgun down and grabbed his walking stick, which was approximately six-feet long and made of thick wood.  Claude testified that Lowe struck Michelle on the top of her head with the stick, causing her to briefly lose consciousness and begin to bleed from her head. Michelle eventually convinced Lowe and Mattie to allow her to go out to her car—the white Monte Carlo—to look for the billfold.  Claude testified that as Michelle looked through the car, Mattie sat on top of her, sometimes striking her head with her hand and telling her that Lowe would kill her if she failed to find the wallet.

Lowe eventually ordered everyone back inside the home, continuing to strike Michelle as she exited the car.  Claude testified that upon returning to the home, he was able to calm Lowe somewhat.  They gave Michelle a dishrag

4

to attempt to stop her head from bleeding, and Mattie accompanied Michelle to the shower to try to clean the wound.  Claude, who remained in the kitchen, claimed that the beating resumed shortly after they took Michelle back to the bathroom.  He claimed that he saw Mattie strike Michelle again with the walking stick.  While Lowe and Mattie were occupied with Michelle, Claude ran from the home and, eventually, made his way to his mother's home.

Lowe presented a starkly different account of the incident in his trial testimony.  Lowe testified that when the couples separated after the first night of partying, they did not plan to meet back up.  He stated that he and Mattie drove into town to pick up more whiskey and cigarettes.  Lowe claimed that he resumed drinking on the trip home and blacked out during the drive.  According to Lowe, he remembered walking in the front door of the home to discover Claude and Michelle running out of his master bedroom.  Mattie informed him that his wallet was missing, so he grabbed his shotgun, stepped outside, and fired two shots into the air.  He then claimed to have blacked out again, rousing briefly to see Michelle passed out in the road bleeding and Mattie crying nearby, only to black out again.  Lowe claimed that he finally regained consciousness when he was sitting handcuffed to his porch swing.

Police searched the entirety of Lowe's home and the surrounding area.  Investigators found numerous items covered in blood:  the walking stick—split in two pieces; a Jim Bean whiskey bottle; the shotgun; a dishrag; and a t-shirt.  The police additionally tested the blood found on Lowe and Mattie.  DNA testing later identified the blood on several of the items, including clothing worn by

Lowe and Mattie, as Michelle's blood. Medical examination of Michelle's body determined that she died as result of blunt force trauma to her head.

Lowe and Mattie were both charged with complicity to murder, first-degree unlawful imprisonment, and tampering with physical evidence.[2] The jury ultimately convicted Lowe on all counts and recommended a sentence of life in prison with the possibility of parole. Lowe now appeals his conviction and sentence as a matter of right.[3]

## II. ANALYSIS

### A. The trial court did not improperly admit KRE 404(b) evidence.

Lowe first asserts that the circuit court should have excluded two instances of testimony concerning other uncharged criminal acts. We review a trial court's evidentiary rulings for an abuse of discretion.[4] A trial court's ruling is an abuse of discretion if the ruling is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[5]

KRE 404(b) prohibits a party from introducing "evidence of other crimes, wrongs, or acts … to prove the character of a person in order to show action in conformity therewith." The rule sets out two exceptions to this general prohibition. First, evidence of an uncharged, wrongful act may be admissible if offered for some purpose other than the accused's character. Second, evidence

---

[2] This Court recently considered Mattie's appeal in a separate opinion. *Mattie v. Commonwealth*, 2020-SC-0090-MR, 2021 WL 731486 (Ky Feb. 18, 2021).

[3] Ky. Const. §110.

[4] *Ordway v. Commonwealth*, 391 S.W.3d 762, 774 (Ky. 2013).

[5] *Id.* (quoting *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999)).

6

of bad acts that are "inextricably intertwined with other evidence essential to the case" may be admissible if separating "the two could not be accomplished without serious adverse effect on the offering party."

### i. *Evidence of prior incidents of domestic violence between Lowe and Mattie.*

Lowe contends that the introduction of a recorded police interview during which Mattie claimed that he had beaten her severely enough to warrant medical attention violated KRE 404. This argument is preserved by Lowe's objection as the audio recording was being played before the jury. He argued that he had not received notice of these recorded statements and that, even if notice had been given, such evidence was not relevant for a non-character purpose. In response, the Commonwealth argued that such evidence was not being offered to prove that Lowe acted in conformity with his prior conduct, but to explain the source of bruises on Mattie's body. In her opening statement, Mattie identified herself as an "abused spouse." Under the Commonwealth's theory, Mattie's opening statement implied that she may have received the bruises on the night of Michelle's death and opened the door to her statements in the recorded interview which indicate such bruises may predate the night of Michelle's death. The trial court agreed and overruled the objection.

On appeal, Lowe principally relies on 404(b) and argues that the significant prejudice posed by Mattie's statements outweighs any possible

7

probative value.[6]  We turn, as we often do, to the analytical framework set out in *Bell v. Commonwealth* to address this argument.[7]  Under that framework, we must assess the relevance, probativeness, and prejudice of an admitted item of evidence.

We begin with relevance.  In admitting evidence of an uncharged criminal or wrongful act, the reviewing court must determine if the evidence is being offered "for some other purpose than to prove the criminal disposition of the accused."[8]  Moreover, the evidence must make the existence of a material fact to the dispute more or less probable than it would be without the evidence.[9]  Mattie's statements pass this bar.  Mattie claimed, through her opening statement, that she woke up bruised, battered, and with no memory of the day of the incident.  That statement, without context, raises the reasonable inference that Mattie was also attacked on the night of the incident and received medical treatment for injuries sustained in that attack.  Mattie's statements provide context that casts skepticism on that inference.  The officer who questioned her at the hospital testified that he believed, based on his observation and experience, that Mattie's injuries could not have been the source of the significant amount of blood on her person due to their age and

---

[6] We note that Lowe's trial counsel also objected to the issue of notice under KRE 404(c).  Lowe does not raise the issue of lack of notice before this Court, so we confine our consideration of the issue to KRE 404(b).

[7] 875 S.W.2d 882, 889 (Ky. 1994).

[8] *Id.*

[9] KRE 401.  *See also Southworth v. Commonwealth*, 435 S.W.3d 32, 54 (Ky. 2014).

severity (or lack thereof). Mattie's statements identify a source of those injuries—a physical altercation with Lowe that predated this incident by several days—consistent with the officer's observations. In short, the statements were relevant.

Next, we must consider whether "evidence of the uncharged crime [is] sufficiently probative of its commission by the accused to warrant its introduction into evidence."[10] Whereas the relevance prong considers the relation between the evidence offered and the charged offense, the probativeness inquiry concerns the relation between the evidence offered and the act it purports to establish. A reviewing court must determine if the jury could "reasonably infer that the prior bad acts occurred and that the [defendant] committed such acts[.]"[11] Here, Mattie claimed that Lowe assaulted her. Lowe seemingly does not contest the accuracy of that statement. Absent evidence in the record to the contrary, the statement is sufficiently probative of that act

Finally, we must ask whether the "potential for prejudice from the use of other crimes evidence outweighs its probative value."[12] Importantly, an item of evidence is not prejudicial simply because it harms the party against whom it is offered. An item of evidence is *unduly* prejudicial if it "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or

---

[10] *Bell*, at 890.

[11] *Jenkins v. Commonwealth*, 496 S.W.3d 435, 457 (Ky. 2016).

[12] *Bell*, at 890.

otherwise may cause a jury to base its decision on something other than the established propositions in the case."[13]  On one hand, the risk of prejudice to Lowe is significant.  It is reasonable to argue that a juror who has heard that the defendant assaulted another woman may be more likely to reach a character-based judgment that he assaulted another than one who has not.  Moreover, the probative value of Mattie's statement—at least when considered solely by reference to the Lowe's guilt of the charged offense—is quite low.  The fact that Lowe allegedly committed an assault against another victim does not entitle one to conclude that he murdered the victim in this case.  In this case, however, the evidence was offered not to prove that Lowe committed the offenses he was charged with but to cast doubt on Mattie's argument that she was assaulted that night and was not involved as a perpetrator.  In that light, the evidence's probative value is notably higher.  Further, it is unlikely that this evidence aroused more sympathy in Mattie's favor than Lowe's as each received life sentences.  On balance, we determine that probative value of Mattie's statements is not *substantially outweighed* by the risk of undue prejudice.

## ii. *Evidence of Mattie's treatment at the hospital.*

Lowe next argues that admission of testimony that Mattie complained of vaginal pain, which was treated at the hospital, violated KRE 404(b).  Lowe failed to make a contemporaneous objection to this testimony, so we review for

---

[13] *Helton v. Commonwealth*, 595 S.W.3d 128, 132 (Ky. 2020).

palpable error.[14]  To prevail under palpable error review, a party must show "[a]

probability of a different result or error so fundamental as to threaten a

defendant's entitlement to due process of law."[15]  Lowe fails to make such a

showing.

The mention of Mattie's vaginal pain occurred twice during trial.  Each

time, the witnesses briefly stated that she was brought to the emergency room

due to complaints of pain in her mouth and vaginal area.  Lowe asserts that

these statements are unduly prejudicial because of the suggestion that Lowe

may have caused said pain.  Though this inference may be possible, it is

unlikely and, in any event, not so prejudicial as to warrant reversal under the

palpable error standard.  At most, the jury heard two brief mentions of the pain

and nothing more.  In comparison, the jury heard testimony that Lowe struck

the victim in the head with a walking stick and was discovered near Michelle's

body covered in her blood.  Ultimately, there was no substantial possibility that

the exclusion of Mattie's complaints of vaginal pain would have swayed the

outcome of this case.

**B. The trial court did not improperly admit victim impact testimony.**

Lowe finally argues that the trial court erred in permitting Claude,

Michelle's boyfriend, to offer victim impact testimony during the guilt phase of

the trial.  Lowe failed to object to this issue at trial, so we again review for

palpable error.

---

[14] Kentucky Rule of Criminal Procedure (RCr) 10.26.

[15] *Martin v. Commonwealth,* 207 S.W.3d 1, 3 (Ky. 2006).

During the guilt phase of a trial, the prosecution must refrain from introducing evidence "intended to arouse sympathy for the families of victims."[16] Though such evidence is relevant to determining the ultimate sentence, it often "is largely irrelevant to the issue of guilt or innocence."[17] The prosecution may, however, provide background evidence to "identify the victim as a living person rather than a statistic."[18] The jury may receive "an adequate word description of the victim as long as the victim is not glorified or enlarged."[19]

Here, Claude testified that he and Michelle dated and that she acted as a mother figure for his children and that she was the mother of nine children. He testified that when they were dating, they lived together and would go out to eat, go to the zoo or go out dancing for dates. Throughout the entirety of his testimony, Claude was visibly distraught and often stopped to compose himself. Despite the emotionally charged nature of his testimony, the scope of Claude's statements concerning Michelle is more accurately characterized as background evidence rather than victim impact testimony. While such testimony was presented by an emotionally upset witness who knew the victim personally, at heart, it remains background information and its inclusion is not

---

[16] *Bennett v. Commonwealth*, 978 S.W.2d 322, 325 (Ky. 1998).

[17] *Id.*

[18] *McQueen v. Commonwealth*, 669 S.W.2d 519, 523 (Ky. 1984).

[19] *Stopher v. Commonwealth*, 57 S.W. 3d 787, 803 (Ky. 2001).

12

error and certainly not error so fundamental as to threaten Lowe's entitlement to due process of law.

## III.    CONCLUSION

In consideration of the foregoing, we affirm.

All sitting.  All concur.

COUNSEL FOR APPELLANT:

Adam Meyer
Assistant Public Advocate
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General

Jenny L. Sanders
Assistant Attorney General
Office of the Attorney General