RENDERED:  AUGUST 12, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0777-MR

WILLIAM TERRY JAMISON　　　　　　　　　　　　　　APPELLANT


APPEAL FROM FULTON CIRCUIT COURT
v.　　　　　　HONORABLE TIMOTHY A. LANGFORD, JUDGE
ACTION NO. 16-CR-00113


COMMONWEALTH OF KENTUCKY　　　　　　　　　　APPELLEE


OPINION
REVERSING AND
REMANDING

** ** ** ** **

BEFORE:  CLAYTON, CHIEF JUDGE; COMBS AND DIXON, JUDGES.

COMBS, JUDGE:  Appellant, William Terry Jamison, appeals from an order of

the Fulton Circuit Court denying his RCr[1] 11.42 motion following an evidentiary

hearing.  After our review, we reverse and remand for a new trial.

---

[1] Kentucky Rules of Criminal Procedure.

The underlying facts are summarized in the direct appeal, *Jamison v. Commonwealth*, No. 2017-SC-000622-MR, 2019 WL 1172971, at *1 (Ky. Feb. 14, 2019). Because Jamison received a sentence of 20 years, his direct appeal was heard by the Kentucky Supreme Court, which affirmed his conviction. The Supreme Court recited as follows:

> In late September 2016, Jamison was driving on a highway when Mark Williams drove up on his bumper chasing him at speeds over 80 to 90 miles per hour. Jamison immediately reported the incident to the Lake County, Tennessee, Sheriff's Department. Even before the incident, the Jamison and Williams' [*sic*] families did not get along. On October 1, 2016, Jamison shot and killed Williams when Williams drove up on a tract of farmland where Jamison was working in Fulton County, Kentucky. No one witnessed the shooting. Jamison called 911 and reported "a guy [had] come up to kill [him]." When local law enforcement arrived, Jamison stated that "Mark Williams pulled in behind me, raised his hand with a piece of metal and said he was going to kill me. He's down here under his truck sir." After seeing Williams' body, Deputy Thomas read Jamison his *Miranda*[2] rights and asked whether he would like to speak with officers. Jamison invoked his right to remain silent until he had spoken with an attorney. Deputy Thomas then handcuffed Jamison and took him to the Hickman Police Department.
>
> Jamison was subsequently tried by a Fulton Circuit Court jury. The jury was instructed on murder, first-degree manslaughter, second-degree manslaughter, reckless homicide, and the self-protection statute, KRS[3]

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] Kentucky Revised Statutes.

-2-

503.050, respectively. Jamison was convicted of murder, and the trial court imposed a punishment of twenty years' imprisonment.

On November 20, 2019, Jamison filed a motion to vacate judgment under RCr 11.42. Jamison explained that "there were no issues of fact as to whether [he] shot and killed the victim. . . . The only issue at trial was whether [Jamison] appropriately exercised his right of self-protection." Jamison argued that trial counsel's actions and inactions constituted ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), as adopted in *Gall v. Commonwealth*, 702 S.W.2d 37 (Ky. 1985).

Jamison has alleged numerous bases of deficient performance by counsel. He argued that trial counsel's performance was deficient in not objecting to references made by the prosecutor and witnesses to Jamison's exercise of his Fifth Amendment right **not** to make a statement at the time of his arrest. He also argued that trial counsel's performance was deficient because he raised that very issue himself in opening statement, again on cross-examination, and on direct examination as well.

Jamison argued that defense counsel's performance was deficient in failing to object to and in not requesting a curative instruction regarding the prosecution's misstatement to the jury regarding the burden of proof as it pertains to self-protection.

Jamison also contended that trial counsel's performance was deficient with respect to the testimony of certain state-of-mind witnesses; and in not investigating, calling, or contacting potential character witnesses who would have testified to the victim's reputation for violent and threating actions -- or who would have testified to Jamison's reputation for truthfulness or peacefulness. In addition, Jamison argued that trial counsel was deficient in failing to object to and to request a curative instruction regarding inadmissible opinion and hearsay testimony from the victim's brother, which trial counsel had elicited, and upon which the prosecution relied in final argument.

Jamison also asserted that trial counsel was deficient in failing to object to or to request a curative instruction regarding a statement that the prosecutor made in closing argument about his personal belief. Finally, Jamison argued that trial counsel was deficient for failing to tender an instruction on first-degree manslaughter.

On September 21, 2020, the circuit court conducted an evidentiary hearing on the RCr 11.42 motion. On June 28, 2021, the court entered findings of fact, conclusions of law (FFCL), and order denying Jamison's motion which we discuss in our analysis below.

On July 1, 2021, Jamison filed a notice of appeal to this Court. We have clear precedential guidelines governing our review of matters brought pursuant to RCr 11.42.

> Claims of ineffective assistance of counsel are evaluated under the two-part standard of *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), adopted by this Court in *Gall v. Commonwealth*, 702 S.W.2d 37 (1985).
>
> *Strickland* first requires that a defendant "must show that counsel's performance was deficient." 466 U.S. at 687, 104 S. Ct. 2052. This is done by "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *id.* or "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S. Ct. 2052. But this review is "highly deferential" to trial counsel, and thus a "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689, 104 S.Ct. 2052 (internal quotation marks omitted). A defendant is not guaranteed errorless counsel or counsel that can be judged ineffective only by hindsight, but rather counsel rendering reasonably effective assistance at the time of trial. *Id.* . . . .
>
> Next, the defendant "must show that the deficient performance prejudiced the defense." *Strickland,* 466 U.S. at 687, 104 S. Ct. 2052. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* To make this showing, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S. Ct. 2052. A reviewing court must consider the totality of the evidence before the jury and assess the overall performance of counsel throughout the case to determine whether the specifically complained-of acts or omissions are prejudicial and overcome the presumption that counsel rendered reasonable professional assistance. *Id.* at 695, 104 S. Ct. 2052 . . . .

Finally, "[u]nless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland* 466 U.S. at 687, 104 S. Ct. 2052.

*Commonwealth v. McKee*, 486 S.W.3d 861, 867 (Ky. 2016).

Where, as here, an evidentiary hearing is held on a RCr 11.42 motion, we review the trial court's factual findings under the clearly erroneous standard. CR[4] 52.01. "Findings of fact are clearly erroneous if they are not supported by substantial evidence. Even though claims of ineffective assistance of counsel are subject to *de novo* review, a reviewing court should defer to the determination of facts made by the trial judge." *Logan v. Commonwealth*, 446 S.W.3d 655, 658-59 (Ky. App. 2014) (citations omitted).

First, we consider and dispose of Jamison's arguments at pages 23-24 of Appellant's brief captioned, "G. Other Prosecutorial Misconduct" and "H. Lack

---

[4] Kentucky Rules of Civil Procedure.

of Request for First-Degree Manslaughter Jury Charge[.]" We note that they are not preserved for our review. Jamison states that the trial court did not address either of these issues in its findings. RCr 11.42(6) provides as follows:

> At the conclusion of the hearing or hearings, the court shall make findings determinative of the material issues of fact and enter a final order accordingly. If it appears that the movant is entitled to relief, the court shall vacate the judgment and discharge, resentence, or grant him or her a new trial, or correct the sentence as may be appropriate. **A final order shall not be reversed or remanded because of the failure of the court to make a finding of fact on an issue essential to the order unless such failure is brought to the attention of the court by a written request for a finding on that issue or by a motion pursuant to Civil Rule 52.02**.

(Emphasis added.) Jamison did not make a written request or motion for findings on these issues as required by the rule. Accordingly, we may not review them.

We now turn to Jamison's first argument found at pages 16-17 of Appellant's brief captioned, "B. Fifth Amendment violations[.]" Jamison contends that the prosecutor made statements or elicited testimony from witnesses about Jamison's refusal to give a statement at the time of his arrest. Further, he notes that his trial counsel not only failed to object to this misconduct, but he compounded the error by commenting upon it himself.

In its FFCL and order, the circuit court determined that:

> While [Jamison] may have intelligently invoked his right to speak to a lawyer, [he] was very cooperative with the sheriff's deputies. The defendant himself called to report

the incident and clearly cooperated with the authorities in
every respect. This set the ability of the defense trial
counsel to argue that they were being completely
transparent with the jury.

(Appendix "A" to Appellant's brief at p. 10.)

Jamison argues that the circuit court's finding -- "that the failure to object allowed trial counsel to be 'completely transparent with the jury'" -- is unsupported in the record as defense counsel did not state that this was his strategy. Appellant's brief at p. 16. However, in its review of the direct appeal, the Supreme Court addressed this issue and held that the failure to object was indeed trial counsel's strategy:

> Before trial, defense counsel became worried
> about what the jury might think if it learned
> that Jamison did not give a statement to police. . . . When
> the trial court asked if defense counsel wanted an
> admonition if the issue arose, defense counsel stated, "I
> think it's in my client's best interest to [let the jury know
> about Jamison not giving a statement]."

*Jamison*, 2019 WL 1172971, at *3. On direct appeal, Jamison sought palpable error review. The Commonwealth argued that Jamison had waived[5] the issue. Our Supreme Court agreed, explaining as follows:

> Jamison's defense counsel clearly knew of his client's
> Fifth Amendment rights and determined that his strategy
> at trial was to acknowledge Jamison's constitutional right

---

[5] Waived or invited errors which reflect the knowing relinquishment of a right are not subject to appellate review. *Mullins v. Commonwealth*, 350 S.W.3d 434, 439 (Ky. 2011).

-8-

to not give a statement to police. Regardless of our thoughts concerning this strategy, Jamison's defense counsel knew of the curable trial defect -- Jamison's right to silence -- and deliberately chose not to object each time the prosecution raised the issue. Therefore, the issue was waived.

*Jamison*, 2019 WL 1172971, at *4-5. Therefore, this issue is beyond the scope of our review since the Supreme Court has addressed it.

With regard to this highly disturbing course of conduct by trial counsel, two separate concurring opinions follow this majority opinion. They are wholly devoted to discussing the "ridiculousness" of any determination that we might be precluded from declaring counsel's conduct on this issue to be anything other than prejudicial deficiency.

There is no doubt that commenting on a defendant's right to remain silent is forbidden and that it is of constitutional magnitude. However, the Supreme Court clearly and directly addressed the issue, agreeing with the trial court that counsel's election to maintain silence was strategic, deliberate, and sound -- thus essentially waiving the issue. Two dissenting opinions on this very matter followed the Supreme Court's Opinion on direct appeal.

Out of an abundance of caution to comply with the mandate that the Court of Appeals is bound by the authority of the Supreme Court (as set forth at SCR 1.030(8)(a)), this opinion has declined to elaborate further. It has done so despite extreme reservation about the "soundness" of the alleged strategy, a

-9-

"strategy" that has succeeded in camouflaging what the members of this panel **all perceive** to be a prejudicial deficiency. However, arguably the Supreme Court Opinion has precluded our consideration of the matter.

In granting the RCr 11.42 relief sought by Jamison, this portion of the majority opinion has elected to rely on other error as discussed below about which there can be no allegation of waiver or preclusive effect of the Supreme Court Opinion.

Jamison's next argument at pages 17-18 of Appellant's brief is captioned, "C. Burden of Proof Regarding Self-Defense[.]" Jamison charges that allowing the prosecutor to misstate to the jury (both in opening and in closing argument) that Jamison had the burden of proving self-defense -- *without objection or request for curative instruction* -- was egregious and flagrant error.

However, this issue was also addressed by the Supreme Court on direct appeal. Jamison had argued that the prosecution's actions amounted to prosecutorial misconduct warranting reversal, and the Supreme Court analyzed the issue as follows:

> Defense counsel did not object to any of the statements Jamison alleges constituted prosecutorial misconduct. Therefore, the misconduct must have been flagrant to warrant reversal. Four factors are used to determine whether misconduct is flagrant: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed

before the jury; and (4) the strength of the evidence against the accused."

*Jamison*, 2019 WL 1172971, at *2 (citing *Bowling v. Commonwealth*, 553 S.W.3d 231, 243 (Ky. 2018)).  The Supreme Court concluded that the prosecutor's misstatement was **not** flagrant in light of the totality of the proceedings:

> Jamison contends, and the Commonwealth acknowledges, that **during closing** the prosecutor misstated the law regarding the level of proof needed for self-defense.
>
> . . .
>
> Although the prosecutor's statement here was misleading, that factor is not dispositive to our analysis.
>
> We must also consider that **this single comment** by the prosecution **was extremely isolated**.  It is critical to note that the actual instructions provided to the jury during deliberations contained a proper recitation of the relevant law concerning self-protection.  In fact, after reading the instructions to the jury, the trial judge urged the jury to read them on their own once in the jury room.  Also, after the misstatement of the law by the prosecutor, he subsequently picked up the correct instructions and re-read them to the jury on his own.  As such, it strains credulity to claim that the jury was influenced by the prosecutor's brief misstatement.
>
> Third, the misstatement of law was not deliberately placed in front of the jury.  As previously discussed, the prosecutor misspoke during closing argument.  Nothing from the record indicates that the prosecutor intended to mislead the jury.

*Jamison*, 2019 WL 1172971, at *2-3 (emphases added).

-11-

Jamison argues that "[t]he Kentucky Supreme Court opinion only discovered one such statement in the closing argument, and ultimately found it to be an 'isolated,' 'single comment.'" He continues: "because the misstatement also occurred in the prosecution's opening statement, it was not in fact an 'isolated' or 'single comment,' and likely resulted in the jury assuming this to be the law throughout the trial." Jamison explains that in its FFCL and order, the circuit court addressed the issue "by simply citing some of the language in the Kentucky Supreme Court opinion which as stated previously, failed to appreciate that two statements were made."

From our review, it is not apparent that Jamison actually argued on direct appeal that the prosecution misstated the burden of proof **both** in opening and in closing statements. Regardless, Jamison's argument selectively ignores those portions of the Supreme Court's analysis -- which the circuit court incorporated into its FFCL and order -- that are unfavorable to him. We are not at liberty to re-visit or alter the reasoning of the Supreme Court.

Jamison's third argument beginning at page 18 of his brief is captioned, "D. Self-Defense/Decedent's Character for Threatening and/or Violent Behavior[.]"

> "**In self-defense cases, fear by the defendant of the victim is an element of the defense and can be proved by** evidence of violent acts of the victim, **threats by the victim, and even hearsay statements about such**

**threats, provided that the defendant knew of such acts, threats, or statements at the time of the encounter**." Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 2.15[4][d] (4th ed. 2003). **Such evidence is admissible** because it is not offered to prove the victim's character or to show action in conformity therewith, but **to prove the defendant's state of mind -- his fear of the victim -- at the time he acted in self-defense**. *Saylor v. Commonwealth*, 144 S.W.3d 812, 816 (Ky.2004).

*Ordway v. Commonwealth*, 391 S.W.3d 762, 779 (Ky. 2013) (emphases added).

This concept enjoys a sacrosanct position in our jurisprudence. "There is no controversy about this important and ancient principle that has been consistently observed in our case law." *Id.* at 779 n.9.

Jamison identifies numerous state-of-mind witnesses who should have been called to testify at trial. He asserts that these witnesses would have testified about Williams's threatening behavior and that they had made Jamison aware of the danger to him prior to the shooting. Furthermore, he notes that although his trial counsel knew about these witnesses before trial, none was called other than Walter Goodman -- and the jury never heard Goodman's testimony about an incident where Williams threated to "whip his ass."

We have reviewed the Supreme Court's holding with respect to state of mind on the direct appeal. The Court explained that the trial court sustained objections to the testimony of three witnesses who, according to Jamison, should have been allowed to testify regarding state of mind. The Supreme Court only

-13-

considered the claim of error as to one witness -- a deputy sheriff (Bryan Bargery) -- because Jamison had only raised claims of error as to two of the witnesses in his brief, one of which the Court considered as waived.

The deputy sheriff would have testified that Jamison had related information to him about the driving incident days before the shooting -- when Williams drove up on Jamison's bumper chasing him at 80-90 miles per hour. The Commonwealth had objected on hearsay grounds. The trial court sustained the objection, but it allowed defense counsel to recall the deputy after Jamison testified.

On direct appeal, the Supreme Court held that it was an abuse of discretion for the trial court to sustain the objection to the sheriff's testimony because it would have been offered to prove Jamison's state of mind -- his fear of Williams -- prior to the shooting. Nonetheless, the Supreme Court held that the error was harmless because Jamison had testified about the driving incident himself, and the sheriff's testimony would merely have been cumulative. Furthermore, defense trial counsel made no effort to recall the deputy. Thus, as to his testimony alone, the Supreme Court found that any error was "waived or harmless." *Jamison*, 2019 WL 1172971, at *6.

Walter Goodman was one of the other three witnesses. He was ***not*** allowed to testify at trial about an incident in which Williams had threatened him

(Goodman). It appears that issue was waived; therefore, the Supreme Court did not address it.

The crux of our inquiry at this juncture is an analysis of other witnesses who were never called at trial and whose purported relevance to the case was never reviewed by the Supreme Court on the direct appeal.

Numerous potential witnesses were identified -- whose testimony would have related to the critical issue of Jamison's defense of self-defense by way of establishing state of mind. The proposed testimony of these state-of-mind witnesses is summarized in Jamison's Statement of the Case (Appellant's brief at pp. 4-8). We do not repeat it all here.

### Rob Shumate

Among them, Rob Shumate testified at the RCr 11.42 hearing that he had run into Jamison at a restaurant prior to the shooting and that he told Jamison about a conversation that he (Shumate) had had with Mark Williams; *i.e.*, that Williams said that the next time he saw Jamison, he was going to beat the living sense out of him. (Video Record (VR) 9/21/20 1:26:20.) In his affidavit, Shumate stated that he was visiting Williams at his home and that Williams said he was going to whip Jamison's ass: "show him who was boss . . . and beat him unconscious." Shumate testified that this was approximately six weeks to two months before the shooting.

In its FFCL and order, the circuit court found that:

Despite post trial counsel's exhaustive efforts to find witnesses who could testify and establish that the victim had a reputation for violence, they were unable to produce even one single witness to testify that the victim, Mark Williams, had committed any violent act. Trial counsel and the trial investigator also were unable to produce or present any witnesses that could testify to any violent acts of the victim. **The defendant's post trial counsel at the 11.42 hearing called several witnesses**, including, David Lusk, Neil Botts, Van Cole, Charles Archie, B.J. Stanley, Walt Goodman and Bill Curlin. **Each of these witnesses testified in regard to specific acts or threats that the victim made to them in specific instances**. "A threat to kill or injury [*sic*] someone which is specifically directed at some individual other than the deceased is inadmissible, as it shows only a special malice resulting from a transaction with which the deceased had no connection.["] Driver v. Commonwealth 361 S.W.3d 877, 885-86 (Ky. 2012)][.] None of these witnesses called at the 11.42 hearing established that the victim was the initial aggressor. . . .

The defense post trial counsel's expert, [retired Circuit Court Judge,] Hon. David Jernigan, testified at the 11.42 hearing, after thorough review of the record, that none of the witnesses for the defense were [*sic*] able to relate a single incident of the victim committing a violent act against another person.[6]

Defense counsel was aware of this prior to trial and **wisely decided** not to try to put the victim's character into evidence. Defense counsel, **who has**

---

[6] The circuit court asked Judge Jernigan whether he had seen anything in the affidavits accompanying the RCr 11.42 motion indicating that Williams committed an act of violence against another person. Judge Jernigan testified that "it was mostly in terms of being a bully, **or threatening, or threatening acts**." VR 10/12/20 3:14:13.

> **practiced for many years**, knew that any attempt to try and prove this directly regarding victim's character would play into the hand of the Commonwealth to be able to exploit this inability to show the victim had ever been the initial aggressor . . . .

(Appendix "A" to Appellant's brief at pp. 2-3) (emphases added).

In addition to a rather excessive deference to trial counsel's presumed trial strategy, the circuit court misperceived the issue before it by confusing *admissible* state of mind evidence (which was crucial to Jamison's defense) as an attempt to put the victim's character into evidence.

The circuit court relied upon *Driver*, 361 S.W.3d 877. However, we are persuaded that *Driver* is wholly inapposite to the case before us.

*Driver* involved the admissibility of evidence of prior bad acts committed **by the defendant**, who was convicted of the first-degree assault of his wife. On appeal, the issue was whether trial court erred in admitting KRE[7] 404(b) prior bad act evidence of Driver's previous violence against both his wife (the victim) and his ex-wife. On discretionary review, the Supreme Court explained that KRE 404(b) standards are different for a victim *versus* a third party. The Court held that admission of Driver's prior acts of violence against **his ex-wife** was error because they were remote in time and because a "threat to kill or injure someone which is specifically directed at some individual other than the deceased

---

[7] Kentucky Rules of Evidence.

is inadmissible, as it shows only a special malice resulting from a transaction with which the deceased had no connection." *Id*. at 886. Thus, *Driver* is inapplicable because the threat in the case before us was directed at Jamison himself -- not against a third party.

### Mike Hopper and the Victim's Father, Garland Williams

In addition, the circuit court made an erroneous finding of fact and misperceived the issue before it with respect to trial counsel's failure to call either Mike Hopper or the victim's father to testify at trial. The court explained that:

> The post trial counsel produced at the 11:42 [*sic*] hearing a witness, Mike Hopper, who testified in regard to a statement made by the victim's father following the death of the victim. The statement was apparently made by the victim's father at the local construction business where Mr. Hopper worked. Mr. Hopper, who was from Lake County, the home county of the defendant, knew both the victim, victim's father and family, and the defendant. Hopper stated that he thought it was an unusual statement for a victim's father to have made and that he had related it to the investigator for defendant's trial counsel prior to trial. **His statement were words in effect that the victim's father wished he had told the victim not to go around the defendant or confront the defendant because the defendant would shoot or whip the victim**. Apparently, the victim's father related he even thought about trying to intercept the victim on the day of the shooting. **This revelation to the Court was very concerning to the Court in that it appeared to be evidence that could have been used to help the defendant at trial**. **The defendant's trial counsel during his 11.42 testimony stated that he knew about the statement made by the victim's father after the shooting. However, this Court's analysis did not need**

-18-

> **to be thought about so long since the answer is very plain, Mr. Null is a seasoned trial counsel**. The victim's father was not called to testify by defendant's post trial counsel, and again that decision is obvious to the Court.

(Appendix "A" to Appellant's brief at pp. 7-8) (bold-face emphases added).

Also incorrect is the trial court's finding that Hopper's statement "were words in effect that the victim's father wished he had told the victim not to go around the defendant or confront the defendant because the defendant would shoot or whip the victim." On the contrary, *it was Williams who stated that he was going to* "*whip Jamison's ass*." Apparently, both the court and "the seasoned trial counsel" misperceived a critical matter of fact; nevertheless, the court correctly and duly noted its potential usefulness to defendant in establishing his claim of self-defense.

Jamison explains that the second paragraph of Hopper's affidavit was admitted in lieu his of testimony at the RCr 11.42 hearing so as not to embarrass Williams's father (Garland Williams), who was present in the court room. Hopper testified that the contents of the second paragraph of his affidavit are true and correct. They are as follows:

> Subsequent to Mark Williams being shot by Terry Jamison on October 1st, 2016 I was in the office at Coffee Construction Company in Hickman, Kentucky when **Garland Williams** came into the business and **made the statement** in front of me and Justin Morris, a fellow employee, **that Mark Williams, his son, on the**

**day that he was shot told his father, Garland Williams, that he was going down to where Terry Jamison was working in a field and "whip his ass**." Justin Morris and I both heard Garland Williams make this statement and we discussed, between us, why he would make such a statement.  Garland Williams further stated that he told Mark to leave Terry Jamison alone, that he was "going to shoot you."  Garland Williams further stated that he was glad he did not go down to where Terry Jamison was because he may have shot him too.

(Record on Appeal, No. 21-CA-0777-MR, Vol. II, at p. 233, Defendant's Exhibit "K") (bold-face emphases added).

The critical importance of the existence of a threat has been highlighted by *Brock v. Commonwealth*, 947 S.W.2d 24, 29 (Ky. 1997):  "**Even an uncommunicated threat by the deceased against the defendant is admissible to show the deceased's state of mind prior to the killing and as evidence to prove who was the aggressor**." (Emphasis added.)  In *Brock*, our Supreme Court explained as follows:

> [T]he primary evidentiary fact to be decided by the jury as framed by the instruction on self-protection was which party was the initial aggressor.  **Evidence that shortly before the encounter, the deceased told his mother that he was going to Appellant's house with a purpose to kill him was more than just cumulative evidence of "bad blood." It was evidence which the jury may well have found decisive on Appellant's claim of self-defense**. Exclusion of this evidence on grounds that it was cumulative was **outside the discretion normally exercised by a trial judge** in performing the KRE 403 balancing test.

-20-

*Id.* (bold-face emphases added).

Clearly, this evidence was significant. "It was evidence which the jury may well have found decisive on Appellant's claim of self-defense." *Id.* Thus, we must consider that the circuit court erred in summarily concluding that trial counsel's failure to call these witnesses was a matter of sound or even minimally correct strategy.

### Honorable David Jernigan

Honorable David Jernigan -- whose testimony the circuit court failed to address other than by a passing reference -- testified about the critical role of the witnesses testifying as to state of mind. Judge Jernigan opined that it was within the realm of professional norms to have introduced this type of evidence during a self-defense criminal trial -- and that the failure to call these witnesses was a deviation from the standard of care in the prevailing professional norms. Furthermore, Judge Jernigan noted that this testimony was important to Jamison's defense of self-defense, state of mind, **and the opportunity to give the jury the information it needed to conclude whether or not Jamison was afraid of the decedent**. Judge Jernigan believed that all of these deficiencies on the part of trial counsel created a reasonable probability that the results of the trial would have been different absent the deficiencies. Judge Jernigan's opinions were expressed within a reasonable degree of legal certainty.

We are satisfied from our review that Jamison met his burden of proving both the deficiency and prejudice prongs of *Strickland.* We find the reasoning in a decision of one of our sister states to be relevant and persuasive:

> Without the relevant state-of-mind evidence, the core of the defendant's case was not put before the jury, thereby denying the defendant the opportunity to effectively mount his defense. . . . The jury should have been allowed to hear *why* he had that belief. They would then be free to accept or reject it; but it was error to keep it from them. This deprived the defendant of a fair trial.

*People of Illinois v. Hamilton*, 2019 IL App (1st) 170019, 147 N.E.3d 922, 933 (Ill. App. Ct. 2019).

As a result of trial counsel's deficiencies, the core of Jamison's case was not put before the jury, thereby denying Jamison the opportunity to effectively mount his defense. The jury should have been allowed to hear the testimony of the state-of-mind witnesses. The result of this deficiency was prejudicial in that it created a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. In light of our decision, we need not address Jamison's remaining arguments.

We reverse the decision of the Fulton Circuit Court that denied Jamison's RCr 11.42 motion, and we remand this case for a new trial.

CLAYTON, CHIEF JUDGE, CONCURS AND FILES SEPARATE OPINION.

-22-

DIXON, JUDGE, CONCURS IN RESULT AND FILES SEPARATE OPINION.

CLAYTON, CHIEF JUDGE, CONCURRING:  I concur with the majority's well-reasoned opinion.  However, I write separately to express my concern that trial counsel's failure to object to the "Fifth Amendment Violations" was trial strategy.  I agree with the majority that in the direct appeal, the Kentucky Supreme Court referred to the trial counsel's failure to object as trial strategy.  Nevertheless, I do not believe that this language was the holding of the case.

The Kentucky Supreme Court has stated "[v]iolations of constitutional rights, the same as of other rights, may be waived by failure to make timely and appropriate objection."  *Futrell v. Commonwealth*, 437 S.W.2d 487, 488 (Ky. 1969) (citations omitted).   Moreover, a separate panel of this Court held:

> [w]hen a defendant's attorney is aware of an issue and elects to raise no objection, the attorney's failure to object may constitute a waiver of an error having constitutional implications.  In the absence of exceptional circumstances, a defendant is bound by the trial strategy adopted by his counsel even if made without prior consultation with the defendant.  The defendant's counsel cannot deliberately forego making an objection to a curable trial defect when he is aware of the basis for an objection.

*Salisbury v. Commonwealth*, 556 S.W.2d 922, 927 (Ky. App. 1977) (citations omitted).  Although the Kentucky Supreme Court in Jamison's direct appeal referenced trial strategy the holding concerns waiver.  Furthermore, *Strickland*, 466

U.S. at 689, 104 S. Ct. at 2065, requires **sound** trial strategy. It is hard to believe that a strategy that involves ignoring a constitutional right is sound strategy.

Further, the Supreme Court held in *Martin v. Commonwealth* that:

> When an appellate court engages in a palpable error review, its focus is on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process. However, on collateral attack, when claims of ineffective assistance of counsel are before the court, the inquiry is broader. In that circumstance, the inquiry is not only upon what happened, but why it happened, and whether it was a result of trial strategy, the negligence or indifference of counsel, or any other factor that would shed light upon the severity of the defect and why there was no objection at trial. Thus, a palpable error claim imposes a more stringent standard and a narrower focus than does an ineffective assistance claim. Therefore, as a matter of law, a failure to prevail on a palpable error claim does not obviate a proper ineffective assistance claim.

207 S.W.3d 1, 5 (Ky. 2006).

Based on the foregoing reasons, I believe that we could address these deficiencies. However, the majority's decision that we are precluded from doing so does not hinder our remanding this case to the trial court -- a decision with which I fully concur.

DIXON, JUDGE, CONCURRING IN RESULT: While I agree with the majority on almost all points of this opinion, I do not agree that the Supreme Court's ruling

concerning Jamison's trial counsel's failure to object precluded the claim of ineffective assistance of counsel due to counsel's "trial strategy."

First, the Supreme Court's Opinion on the issue indicates the magnitude of the Fifth Amendment violation:

> Before trial, defense counsel became worried about what the jury might think if it learned that Jamison did not give a statement to police. The trial court assured counsel that if it became an issue, it would admonish the jury. The prosecutor stated that he only intended to demonstrate that Jamison did not give a statement to police, and nothing further. When the trial court asked if defense counsel wanted an admonition if the issue arose, defense counsel stated, "I think it's in my client's best interest to [let the jury know about Jamison not giving a statement]." Later in the pre-trial hearing, regarding the same issue, the trial court stated:
>
>> Trial Court: Are you going to acknowledge [that Jamison did not give a statement]?
>>
>> Defense Counsel: Yes.
>>
>> . . . .
>>
>> Trial Court: Alright, so it sounds like a non-issue at this point.
>>
>> Defense Counsel: Right.
>>
>> Trial Court: If it develops into an issue, gentlemen, bring it to my attention and I'll rule accordingly.
>>
>> Defense Counsel: Okay.

During trial, Jamison's refusal to give a statement at the scene turned into a focal point for the prosecution. On eight separate instances, the prosecutor stated or elicited a statement from a witness regarding the lack of a statement by Jamison; specifically, the prosecutor elicited testimony from law enforcement officers that the first thing a police officer would do if he was involved in a shooting would be to give a statement. These statements and elicited responses occurred at every stage of trial; once during opening argument, four times during the Commonwealth's case in chief, once on cross-examination of Jamison, and twice during closing argument.

During his opening statement the prosecutor stated, "We don't know what happened [to the trailer hitch] because he declined to comment to police."

During re-direct of Officer Joey Adams:

> Commonwealth: He talked to you about an officer shooting, which has absolutely nothing to do with this case. But, the fact of the matter is, what's the first thing that happens when an officer is involved in a shooting? Does he give a statement?
>
> Sgt. Adams: Yes. I gave a statement to my lieutenant at the time.
>
> Commonwealth: So you gave a statement?
>
> Sgt. Adams: Explaining what happened yes.

During direct examination of lead Detective Hamby:

> Commonwealth: Were you able to talk to [Jamison] at any time?
>
> Det. Hamby: I did attempt to talk to him later in the evening, but not immediately, no.

Commonwealth: Did you receive any information when you talked to [Jamison]?

Det. Hamby: No, he chose not to make a statement.

On re-direct of Detective Hamby:

Commonwealth: What is the first thing that happens when an officer is involved in a shooting?

Det. Hamby: They are typically interviewed.

Commonwealth: They give a statement about what happened is that what you are saying?

Det. Hamby: That's correct.

Commonwealth: The very first thing?

Det. Hamby: In probably 99% of the cases, yes.

On cross-examination of Jamison:

Commonwealth: Why did you need time before you made your statement?

Jamison: Sir, my mind wasn't clear and I was scared.

Commonwealth: Of Deputy Thomas?

Jamison: No, just from the incident.

Commonwealth: But you didn't give a statement to Deputy Thomas of what happened?

Jamison: They read me my rights, and told me to [*sic*] I had the right . . . [.]

Commonwealth: So, you exercised your right not to say anything?

Jamison: Yes sir, I remained silent, yes sir.

Commonwealth: After you shot a man down in cold blood[?]

Jamison: No sir.

Commonwealth: Nothing further.

During closing argument, the prosecution drew an analogy between what law enforcement officers do and what Jamison did not do after involvement in a shooting:

Commonwealth: What is the first thing an officer is required to do [when involved in a shooting]? Give a statement. We didn't have a statement here. So, Det. Hamby had to go on what information he had.

And finally, later in closing:

Commonwealth: And then he met Deputy Thomas. Deputy Thomas read him his rights, and he declined to talk any further, and he had that right. Cory Hamby began his investigation on what he had, what information he had that night.

Throughout the entire trial, defense counsel never objected to the prosecutor's questions, statements, or elicited testimony regarding Jamison's refusal to give a statement. Defense counsel also allowed the Commonwealth to play a body cam video of Jamison being read his *Miranda* rights, asking for an attorney, and being placed in handcuffs. Furthermore, defense counsel raised Jamison's refusal to give a statement on his own during his opening statement, during cross-examination

of the Commonwealth's main witness, and during direct examination of Jamison.

Defense counsel did not object to any statements made by the prosecution regarding Jamison's election to speak with an attorney prior to giving a statement. In his brief, Jamison seeks palpable error review under RCr 10.26. The Commonwealth asserts that Jamison waived any review on appeal because of the above statements made by defense counsel during pre-trial hearings and the lack of objection during trial. Indeed, when not waived by lack of objection, comments such as those made by the Commonwealth have been held to have eviscerated a defendant's Fifth Amendment rights, requiring reversal. *See, e.g.*, *Doyle v. Ohio*, 426 U.S. 610, 618 (1976).

*Jamison*, 2019 WL 1172971, at *3-5.

As noted by the majority opinion, the Supreme Court determined that a constitutional right may be waived. Citing *West v. Commonwealth*, 780 S.W.3d 600 (Ky. 1989), the Court determined trial strategy may constitute a waiver. However, the Court also inferred it was troubled about this waiver: "[r]egardless of our thoughts concerning this strategy, Jamison's defense counsel knew of the curable trial defect -- Jamison's right to silence -- and deliberately chose not to object each time the prosecution raised the issue." *Jamison*, 2019 WL 1172971, at *5.

I believe the majority opinion misapprehends the import of the Supreme Court's holding on direct appeal. I agree, the Supreme Court held Jamison's defense counsel waived the Fifth Amendment right at trial. But it is

-29-

*counsel's very decision* to waive Jamison's Fifth Amendment rights that Jamison now contends was ineffective assistance of counsel. The Supreme Court's decision on direct appeal did not -- and indeed could not -- make any ruling on *this issue*. *This issue* was not before it. Furthermore, on this basis, Chief Judge Clayton's succinct analysis in her concurring opinion makes clear this issue alone merits reversal. Defense counsel's "trial strategy" herein resulted in not only mentioning but clearly weaponizing a fact which Jamison had every constitutional right to claim. By doing so, the violation was egregious and merits reversal, and Jamison is entitled to a new trial with perhaps a new trial strategy.


BRIEFS FOR APPELLANT:

Stacey A. Blankenship
Paducah, Kentucky

Charles S. Kelly
Dyersburg, Tennessee

Joe G. Riley
Ridgely, Tennessee

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Perry T. Ryan
Assistant Attorney General
Frankfort, Kentucky